1  BRIAN J. STRETCH (CABN 163973)
United States Attorney

2
DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  WILLIAM FRENTZEN (LABN 24421)
DAMALI TAYLOR (CABN 262489)
5  SCOTT D. JOINER (CABN 223313)
Assistant United States Attorneys

6
        450 Golden Gate Avenue, Box 36055
7       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
8       FAX: (415) 436-6753
        william.frentzen@usdoj.gov
9       damali.taylor@usdoj.gov
        scott.joiner@usdoj.gov
10
Attorneys for United States of America
11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                        SAN FRANCISCO DIVISION

15

16  UNITED STATES OF AMERICA,            )  CASE NO. CR 13-00764 WHO
                                         )
17          Plaintiff,                   )  UNITED STATES' MOTIONS IN LIMINE
                                         )
18      v.                               )  Date:      June 17, 2016
                                         )  Time:      9:00 AM
19  ALFONZO WILLIAMS, et al.,            )  Court:     Hon. William H. Orrick
                                         )            Courtroom 4, 17th Floor
20          Defendants.                  )
                                         )
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

MOTIONS *IN LIMINE* ..........................................................................................1

I.    <u>Motion *in Limine* No. 1:</u>  Extrinsic Evidence for Impeachment Should be Precluded....................1

II.   <u>Motion *in Limine* No. 2:</u> The Court Can And Should Consider Evidence Already Presented To The Court In Determining The Admissibility of Evidence At Trial........................2

III.  <u>Motion *in Limine* No. 3:</u> Cooperation Agreements Are Admissible. .................................3

IV.   <u>Motion *in Limine* No. 4:</u>  The Defendants Should be Required to Proffer a Good-Faith Basis for Any *Henthorn*-Type Inquiry of a Law Enforcement Witness.....................................4

V.    <u>Motion *in Limine* No. 5:</u> The Defendants Should Be Required To Provide Some Evidentiary Basis For Any Claim Of Duress Or Self-Defense...........................................5

VI.   <u>Motion *in Limine* No. 6:</u> The Defendants Should Be Required To Provide Some Evidentiary Basis For Any Claim That Someone Else Committed A Crime Or Act. ...................5

VII.  <u>Motion *in Limine* No. 7:</u> The Defendants Should be Precluded From Arguing Any Negative Inference From The Absence Of Any Particular Type Of Evidence Or Testing.......................................................................................................7

VIII. <u>Motion *in Limine* No. 8:</u> The Defendants Should be Precluded From Introducing Information Not in Evidence to the Jury ...............................................................8

IX.   <u>Motion *in Limine* No. 9:</u> Rule 404(b) Does Not Bar Any of the Evidence in this Case................8

X.    <u>Motion *in Limine* No. 10:</u> The Court Should Admit Certain Rap Songs And Videos That Are Probative Of The Charged Crimes. ........................................................10

        A.   The Proffered Songs Are Probative of the Charged Crimes.............................10

               1.   "Neva Luhhed Us" Video .................................................11

               2.   "Anxious" Audio .........................................................12

               3.   "Poundcake" Audio .......................................................12

               4.   "Big Bank" Video ........................................................13

               5.   "Ridin With Dat 5<u>th</u>" Video ............................................14

               6.   "Strictly Pimpin" Audio..................................................14

               7.   "Real One" Video ........................................................15

               8.   "Racks" Video ...........................................................15

        B.   Videos to Be Played (Mostly) Without Audio....................................15

        C.   Defendant Young's Statements in "Strictly Pimpin" Are Party Admissions .................16

D.    The Remaining Songs Admissible As Co-Conspirator Statements ....................................17

E.    Such Evidence is Generally Admissible .........................................................................20

F.    The Video and Audio Evidence is Not Unduly Prejudicial .............................................22

XI.    Motion *in Limine* No. 11: The Defendants Should be Precluded from Referencing Punishment or Introducing Argument or Evidence of Previous Charging Decisions. ...................24

XII.    Motion *in Limine* No. 12: Fed. R. Evid. 609 Allows the Use of the Defendants' Prior Convictions for Impeachment. ......................................................................................................25

CONCLUSION.......................................................................................................................................26

**INTRODUCTION**

The United States (the "government") submits the following motions *in limine* for the Court's consideration. The government respectfully requests the opportunity to supplement these motions *in limine* if additional legal issues arise requiring the Court's intervention. In addition, because the defense has not yet completed required reciprocal discovery, the government also requests the opportunity to supplement these motions *in limine* to address any issues triggered by the defense.

**MOTIONS *IN LIMINE***

**I.    Motion *in Limine* No. 1:  Extrinsic Evidence for Impeachment Should be Precluded.**

The United States anticipates that the defendants, for purposes of impeachment, will seek to present exhibits or witness testimony suggesting that law enforcement witnesses testifying for the government engaged in misconduct. Such extrinsic evidence is generally not admissible, however, except under limited circumstances.

Under Rule 608(b), a party may ask a witness about specific conduct on cross-examination if doing so would be probative of the witness's credibility, but a party may not go beyond inquiring and seek to admit extrinsic evidence simply to impeach the witness. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 (9th Cir. 2009) (noting that Rule 608(b) "generally prohibits the introduction of extrinsic evidence to attack the credibility of a witness"); *United States v. Castillo*, 181 F.3d 1129, 1132-33 (9th Cir. 1999) ("Rule 608(b) prohibits the use of extrinsic evidence of conduct to impeach a witness' credibility in terms of his general veracity."); *United States v. Bosley*, 615 F.2d 1274, 1276-77 (9th Cir. 1980) (holding that district court erred by allowing government to call witness to contradict defendant's statement made on cross-examination); *see also United States v. Hickson*, 585 F.3d 1247, 1258, 1266 (9th Cir. 2009) (*en banc*) (in reviewing denial of motion for new trial, affirming district court holding that additional affidavits serving to impeach key government cooperating witness would not have been admissible pursuant to Fed. R. Evid. 608(b)).[1]

---

[1] In an unpublished decision, the Ninth Circuit also held that the district court properly denied, pursuant to Fed. R. Evid. 608, the defendant's motion to impeach an agent with witness testimony about the agent's putative past perjured testimony and explained that "[t]his extrinsic evidence would have created a mini-trial on Agent Goldberg's past behavior, the very distraction Rule 608 seeks to guard against." *United States v. Burns*, 2000 WL 898739, at 4 (9th Cir. July 6, 2000). The *Burns* panel relied on the Eighth Circuit decision in *United States v. Martz*, 964 F.2d 787, 789 (8th Cir. 1992), which held that, "The purpose of barring extrinsic evidence is to avoid holding mini-trials on peripherally related or

The Ninth Circuit recognizes a limited exception to Rule 608(b)'s general prohibition against the admission of extrinsic evidence for impeachment, called "impeachment by contradiction," which "permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence." *Castillo*, 181 F.3d at 1132. As the Ninth Circuit explained in *Kincaid-Chauncey*:

> Impeachment by contradiction "permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence." *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir.1999). Impeachment by contradiction is an exception to the collateral fact rule embodied in Federal Rule of Evidence 608(b), which generally prohibits the introduction of extrinsic evidence to attack the credibility of a witness… Impeachment by contradiction comes with an important limitation. In general, a witness may be impeached by contradiction only if "the statements in issue [have] been volunteered on direct examination." *United States v. Green*, 648 F.2d 587, 596 n. 12 (9th Cir. 1981) (emphasis added).

*Kincaid-Chauncey*, 556 F.3d at 932. Thus, as *Kincaid-Chauncey* explains, even the exception to Rule 608(b)'s general prohibition against the introduction of extrinsic evidence for the purpose of impeachment comes with a significant limitation: impeachment by contradiction can only be done to impeach statements volunteered on direct examination, not statements elicited on cross-examination. *See Castillo*, 181 F.3d at 1133 (holding that "extrinsic evidence may not be admitted to impeach testimony invited by questions posed during cross-examination").

In light of the explicit prohibition on the introduction of extrinsic evidence for impeachment under Rule 608(b) and Ninth Circuit case law, the defendants should not be allowed to create mini-trials or otherwise distract the jury by introducing extrinsic evidence for the putative purpose of impeachment.

## II. Motion *in Limine* No. 2: The Court Can And Should Consider Evidence Already Presented To The Court In Determining The Admissibility of Evidence At Trial.

Federal Rule of Evidence Rule 104(a) provides that "[p]reliminary questions concerning… the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination *it is not bound by the rules of evidence* except those with respect to privileges." Fed. R. Evid 104(a) (emphasis added). The Supreme Court has "stressed that under Rule 104 of the Federal Rules of Evidence, the trial judge, in making the preliminary factual determination, may consider 'any evidence whatsoever,' with the exception of privileged information, and that the judge is entitled to 'receive the evidence and give it such weight as his judgment and experience

irrelevant matters."

counsel.'" *United States v. Silverman*, 861 F.2d 571, 583 (9th Cir. 1988) (quoting *Bourjaily v. United States*, 483 U.S. 171, 178 (1987)); *see United States v. Brewer*, 947 F.2d 404, 409 (9th Cir. 1991) ("In determining whether the government established the existence of a conspiracy for the purpose of Fed. R. Evid. 801(d)(2)(E), Rule 104 'on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege.'") (citing *Bourjaily* 483 U.S. at 178.) Thus, under Rule 104(a), the Court can and should consider a wealth of evidence in determining the admissibility of evidence at trial. In particular, the Court should look to evidence already presented to the Court when it decides the admissibility of co-conspirator statements under Rule 801(d)(2)(E) at trial.[2]  Although the defendants have spent a substantial amount of time and resources needlessly litigating certain motions, the Court now has before it a fairly comprehensive record establishing the existence of a conspiracy, such as the testimony of Damon Jackson presented during the gang expert hearings, as well as exhibits — e.g., photographs of CDP members, gang signs, and CDP graffiti, murals, and sketches — presented during the hearing and in connection with various pretrial motions.  *See Brewer*, 947 F.2d at 410 (explaining that *Bourjaily* held that Rule 104 permitted a trial court to consider hearsay declarations to determine whether a conspiracy had been established by a preponderance of the evidence).  In short, the pre-trial record can and should be used to augment the trial record in determining the admissibility of evidence.

## III.    **Motion *in Limine* No. 3: Cooperation Agreements Are Admissible.**

The government anticipates that the defendants will attack the government's cooperating witnesses' credibility in part because of their plea agreements.  If the defendants do so, the government would request that the Court admit the plea agreements into evidence to rebut defense arguments about the witness's credibility.  There is ample authority in the Ninth Circuit to support the admission of such cooperation agreements for this purpose.  *See, e.g.*, *United States v. Brooklier*, 685 F.2d 1208, 1218 (9th Cir. 1982) (holding that the government is allowed to introduce cooperating witness's plea agreement in rebuttal after defense attorney referred to witness as "perjurer, paid informant, and murderer who escaped the death penalty by cooperating with the FBI"); *United States v. Rohrer*, 708 F.2d 429, 433

---

[2] *United States v. Larson*, 460 F.3d 1200, 1211 (9th Cir. 2006) (requirements for admission of co-conspirator statement); *see also United States v. Norris*, 428 F.3d 907, 914 (9th Cir. 2005) (court "not required to make any preliminary finding that the government has proved the conditional fact… court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence.") (citations omitted).

(9th Cir. 1983) (holding that trial court properly admitted full text of cooperation agreement into evidence because it "was relevant to material facts at issue"); *see also United States v. Tham*, 665 F.2d 855, 862 (9th Cir. 1981) (in response to defense argument that plea agreement required witness to testify favorably for the government, "it was proper for the prosecutor to rebut that argument by arguing the language of the plea agreement and how it might affect the witness's motivation"). The government is well aware of the proscription against bolstering the truthfulness of the witness's testimony, and will avoid any such bolstering. Nonetheless, as the *Rohrer* court held, the full text of the cooperation agreements in this case will likely be "relevant to material facts at issue" and should be admitted if and when the defendants attack the credibility of any cooperating witness.

**IV.**    <u>**Motion *in Limine* No. 4:**</u> **The Defendants Should be Required to Proffer a Good-Faith Basis for Any *Henthorn*-Type Inquiry of a Law Enforcement Witness.**

The United States also respectfully requests that the defendants be required to make some offer of proof and offer of relevance regarding any alleged misconduct by law enforcement officers outside the presence of the jury prior to inquiring about such alleged misconduct before the jury. That includes any allegation based on a citizen complaint or news report. Such a proffer is especially needed where the area of proposed inquiry relates to alleged officer misconduct that is unrelated to credibility and is based on unsubstantiated allegations. This is appropriate since improper questions regarding such issues as allegations of improper use of force, racism, or illegal search are highly inflammatory and should not be casually presented to the jury. Indeed, unsustained complaints against police officers should not be admitted at all. *See*, *e.g.*, *United States v. Jones*, No. 04-10181, 2005 WL 348398, *1-3 (9th Cir. Feb. 14, 2005) (affirming Judge Illston's decision to preclude cross-examination of officers on unsustained complaints); *Brown v. Gutierrez*, No. C03–1141 TEH, 2006 WL 3065574, at*2-3 (N.D. Cal. Oct. 27, 2006) (in civil case, holding that "[t]estimony about the allegations involved in any investigation are excluded" because there was "no finding . . . that [the officer] lied or made false statements"); *Morris v. Lanpher*, No. 05-0362-CV-W-FJG, 2007 WL 1026324, at *1-2 (W.D. Mo. Mar. 27, 2007) (in civil case, precluding questioning of police officer witnesses regarding unsustained complaints against them under Fed. R. Evid. 402). The government should not be placed in the position of constantly having to object, then constantly having to rehabilitate officers based upon irrelevant and unsupported lines of

questioning. The same is true of defense inquiries regarding alleged bad acts of civilian witnesses. The government thus requests the Court decide the admissibility of *Henthorn*-type questioning of witnesses prior to such questioning and outside the presence of the jury. *See* Fed. R. Evid. 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.").

**V.    Motion *in Limine* No. 5: The Defendants Should Be Required To Provide Some Evidentiary Basis For Any Claim Of Duress Or Self-Defense.**

The government is unaware of any evidence tending to indicate that the defendants acted in self-defense or under duress in committing the crimes alleged in the Second Superseding Indictment. Therefore, if any of the defendants intends to offer such a defense to any of the charges or overt acts, he or she should make some offer of proof to the Court sufficient to warrant placing such matters before the jury. The law on this point is clear that such a showing is necessary before the defense raises the issue. While the government bears the burden of proof beyond a reasonable doubt, a defendant is required to make some preliminary showing to support an affirmative defense. "If the evidence is insufficient to support the defense as a matter of law . . . the court may exclude evidence of the defense or refuse to instruct on its elements." *United States v. Karr*, 742 F.2d 493, 497 (9th Cir. 1984); *United States v. Shapiro*, 669 F.2d 593, 596 (9th Cir. 1982). As the Supreme Court stated, "[i]f… an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense." *United States v. Bailey*, 444 U.S. 394, 417 (1980). If no such showing is made, then the Court should restrict the defendants from making any arguments to the jury regarding an affirmative defense.

**VI.    Motion *in Limine* No. 6: The Defendants Should Be Required To Provide Some Evidentiary Basis For Any Claim That Someone Else Committed A Crime Or Act.**

Defendants are always free to assert their own innocence and to claim that a crime was committed by someone else. They may not, however, raise a defense to assert that a specific third-party is guilty without some showing that there is admissible evidence to support the claim. The defendants may not present a "that other guy did it" defense unless they are able to submit evidence actually implicating some other person. Moreover, any such evidence must be admissible: among other things, it

must be relevant, its prejudicial effect must not substantially outweigh its probative value, and it must not confuse or mislead the jury or delay the trial. The government therefore requests that the defendants be required to proffer any such admissible evidence before being allowed to present such evidence or argument to the jury.

It is axiomatic that both prosecutors and defense attorneys may only argue evidence that is actually introduced at trial, along with reasonable inferences from such admitted evidence. *See, e.g.*, *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) (noting that the latitude allowed to both prosecutors and defense attorneys in closing argument "embraces reasonable inferences from the evidence presented at trial"). Accordingly, the defendants in this case should be precluded from presenting any argument pointing the finger at another individual unless they proffer or present admissible evidence to that effect. This is especially true in the third-party guilt context, where a person's reputation is at stake. No one should be subjected to public accusations that he or she is guilty of a federal crime in the absence of evidence supporting such an accusation.

Accordingly, in opening statements, at trial, and in closing arguments, the defendants should be precluded from referencing, arguing, mentioning, or asserting that any other specific person committed the crimes or acts charged unless and until evidence to that effect that has been admitted (or, in the case of opening argument, has been proffered to be admissible) at trial.

Even if the defendants are prepared to proffer evidence implicating some third person as the truly guilty party, it should be treated with great skepticism. Indeed, courts have imposed strict limitations on defendants' attempts to introduce evidence of another person's guilt. Aside from general hearsay and other evidentiary issues, courts have focused on the potential that such evidence carries little probative value and would confuse and mislead the jury. *See, e.g.*, *United States v. Crosby*, 75 F.3d 1343, 1346–49 (9th Cir. 1996) (engaging in an extensive analysis of the probative value, the potential for confusing and misleading the jury and delaying the trial, and the balance between probative value and prejudicial effect of evidence of third-party guilt before determining that it was admissible).

*United States v. Spencer*, 1 F.3d 742, 744–45 (9th Cir. 1992), a felon in possession case where the defendant was a passenger in a car in which a firearm was found under a seat, is also instructive. The defendant there sought to introduce evidence that the owner of the car was arrested five days later in

another car with a gun under the seat. *See id.* at 743. The Ninth Circuit upheld the trial court's refusal to admit such evidence, finding that the district court properly concluded, under Fed. R. Evid. 403, "that the risk of confusing the issues and wasting time outweighed the likely value of any inferences that could conceivably be drawn from the subsequent discovery of a different gun under a different seat in a different car (albeit a car owned by the same person who owned the car in which Spencer was a passenger)." *Id.* at 745 n.2. The Ninth Circuit also found that Fed. R. Evid. 404(b) provided an independent basis to exclude such evidence. *Id.* at 745.

*United States v. Brannon*, 616 F.2d 413, 417–18 (9th Cir. 1980), similarly upheld a district court's decision to exclude putative evidence of third-party guilt on grounds that it was inadmissible. In *Brannon*, a bank robbery case, the defendant presented an alibi defense and called two witnesses in support of the alibi and in support of the defense that a third person committed the crime. *See id.* Another witness looked at surveillance images of the bank robbery and claimed that they might depict the very person the defendant was trying to implicate. *See id.* Nevertheless, the district court declined to admit the pictures because the Court found that the person and the defendant did not look similar. *See id.* The Ninth Circuit upheld this ruling, holding that the district court could properly have concluded that admission of the photographs under Fed. R. Evid. 403 was "likely to confuse the issues or mislead the jury." *See id.* A "defendant is entitled to prove his innocence by showing that someone else committed the crime." *Id.* A defendant has no right to confuse or mislead the jury, however, and cases such as *Crosby*, *Spencer*, and *Brannon* demonstrate the heavy evidentiary burden the defendants must meet before a third party's name and reputation may be implicated in criminal wrongdoing.

## VII. Motion *in Limine* No. 7: The Defendants Should be Precluded From Arguing Any Negative Inference From The Absence Of Any Particular Type Of Evidence Or Testing.

The government, of course, bears the burden of proving each defendants' guilt beyond a reasonable doubt. This burden, however, does not require the presentation of any particular type of evidence. In addition, during the two plus years of this case, the defendants have been given access to the evidence the government has in its possession. Thus, the defendants should not be permitted to make "missing evidence" arguments, *i.e.*, to argue improperly that a particular type of evidence is required in order to convict or that the jury cannot convict without a particular type of evidence. *See,*

*e.g.*, *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (holding that uncorroborated testimony of even a single accomplice witness can be sufficient to convict).

## VIII. Motion *in Limine* No. 8: The Defendants Should be Precluded From Introducing Information Not in Evidence to the Jury.

Fed. R. Evid. 103(c) provides that "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury." Consistent with this rule, the Court should preclude defense counsel from making speaking objections that serve no proper purpose except to present inadmissible information or simple argument to the jury. Similarly, the defense should also not be allowed to read the contents of documents not in evidence to the jury under the guise of questioning a witness or refreshing a witness's recollection.

## IX. Motion *in Limine* No. 9: Rule 404(b) Does Not Bar Any of the Evidence in this Case.

As part of its case-in-chief, the government will seek to admit evidence of both charged and uncharged crimes and other acts committed by the defendants and others. All of this evidence constitutes proof of the existence of the CDP racketeering enterprise and does not fall under the ambit of Fed. R. Evid. 404(b). Fed. R. Evid. 404(b) precludes the admission of "other crimes, wrongs or acts" to prove the character or criminal propensity of the defendant, but allows such evidence to be used for the limited purposes of showing "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This rule does not apply, however, where the evidence that the government seeks to introduce is directly related to or inextricably intertwined with the crimes charged in the indictment. *See United States v. Martinez-Rodriguez*, 472 F.3d 1087, 1091 (9th Cir. 2007) ("Rule 404(b) does not exclude evidence forming an essential element of the charged crime."); *United States v. DeGeorge*, 380 F.3d 1203, 1219 (9th Cir. 2004) (holding that evidence that was inextricably intertwined with alleged criminal activity was not subject to strictures of Rule 404(b)); *see, e.g.*, *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003) (holding that evidence that defendant stole cocaine was directly related to charged drug trafficking conspiracy). As the Ninth Circuit explained, "[t]he policies underlying Rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of

his actions." *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993); *see also United States v. Montgomery*, 384 F.3d 1050, 1061-62 (9th Cir. 2004). This is particularly true in the context of racketeering prosecutions.

For example, in *United States v. Rubio*, 727 F.2d 786, 797-98 (9th Cir. 1983), the Ninth Circuit found no error in the trial court's admission of evidence of the defendant's prior drug conviction as direct evidence, and not as Rule 404(b) material, proving the existence of the racketeering enterprise and association of the defendant in the enterprise. In addition, as Seventh Circuit explained in *United States v. Salerno*, 108 F.3d 730, 739 (7th Cir. 1997), the government must prove the existence of the enterprise, and evidence introduced to establish the existence and nature of the enterprise is not barred by Rule 404(b)'s prohibitions. Likewise, in *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992), the Second Circuit explained that "[p]roof of [RICO] elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant. . . . ." Significantly, the Ninth Circuit quoted *DiNome* in *United States v. Fernandez*, 388 F.3d 1199, 1243 (9th Cir. 2004), when the Ninth Circuit affirmed the denial of a severance motion in a racketeering case, explaining that all the "spillover" evidence about which the defendant complained would have been admissible against him anyway in a separate trial.

Consistent with the law, Judge Alsup, in the MS-13 racketeering case, agreed at the pre-trial conference that the government's representation that it had no Rule 404(b) material was sufficient, and that the defendants needed to object to specific items of evidence that they contended ran afoul of Rule 404(b). *See United States v. Cerna*, February 14, 2011 Pretrial Conference Transcript (ECF No. 3574) at 204-210. As with the MS-13 case, none of the evidence that the government intends to present in its case in chief – including uncharged crimes and other acts committed by non-defendants – will be offered to prove mere criminal propensity. Rather, such evidence will be offered to prove the existence of the charged racketeering enterprise, which is directly probative of the elements of the racketeering-related charges. Accordingly, Rule 404(b)'s prohibition does not apply.

//

//

**X.**   **Motion *in Limine* No. 10:** **The Court Should Admit Certain Rap Songs And Videos That Are Probative Of The Charged Crimes.**

Although there are several dozen rap songs and videos by and related to the defendants, the government has selected only nine which contain lyrics probative of the enterprise, and specific crimes committed by various members of the enterprise, as well as two videos which contain images (without lyrics) relevant to the same. The relevance of the lyrics to this case will be established by testimony from the government's civilian witnesses and cooperators. Audio and video files with all 11 songs will be lodged with the Court. *See* Exhibit 1. Transcripts of the lyrics the government seeks to introduce have further been attached to this Motion as Exhibits 2-9. The songs are titled as follows: (1) *Neva Luhhed Us*, by Sherwin Noriega; (2) *Real One*, by Sherwin Noriega; (3) *Racks*, by Sherwin Noriega; (4) *Anxious*, by Ijeoma Ogbuagu; (5) *Poundcake*, by Ijeoma Ogbuagu; (6) *Big Bank*, by Quincy Brooks ("San Quinn"); (7) *Ridin Wit Dat 5th*, by Tyrice Ivy; (8) *Strictly Pimpin'*, by Jaquain Young and Tyrice Ivy; (9) *Gangstas on Grove*, by William Crawford ("Ya Boy"); (10) *Still in Da Hood,* by William Crawford ("Ya Boy"); and (11) *Loud Thoughts,* by Anthony Galasi ("Frost").

**A.**   **The Proffered Songs Are Probative of the Charged Crimes**

Relevant evidence is evidence tending to make the existence of a fact more or less probable, Fed.R.Evid. 401. Here, the government must prove the existence and structure of an association-in-fact criminal enterprise and a pattern of criminal activity committed in furtherance of that enterprise. Thus, each instance where the defendants are together and/or with other members or associates of CDP is probative evidence. Each time a member or associate of CDP discusses gang territory is highly probative evidence. Each time a member or associate of CDP discusses crimes committed in furtherance of the enterprise—whether murder, pimping, firearms possession, drug trafficking or other crimes—it is highly probative evidence. Finally, each time a member or associate of CDP discusses bringing harm to the gang's rivals, it is highly probative evidence. It makes little difference that these admissions are put to song.

Each of the songs the government seeks to introduce is rapped by a member or associate of CDP, each prominently features CDP members and the majority discusses specific criminal acts by members of CDP. This evidence demonstrates the existence of the CDP criminal enterprise; the defendants'

history with the enterprise; the defendants' unlawful possession and use of firearms; the defendants'

involvement in the murders of Jelvon Helton (2010) and Donte Levexier (2011); and CDP's rivalry with

KOP—which fueled so much of the violence at issue in this case. The crimes discussed in the songs

were committed by the defendants to further the goals of the enterprise and to maintain their positions

therein. To the extent the video evidence contains statements of defendants or their co-conspirators, the

government will seek admission of the evidence as admissions of a party opponent pursuant to Federal

Rule of Evidence 801(d)(2)(A), or as statements made during and in furtherance of the conspiracy

pursuant to Federal Rule of Evidence 801(d)(2)(E), or other evidentiary bases.

### 1. "Neva Luhhed Us" Video

The government seeks to introduce this video by CDP ally Sherwin Noriega ("HunnidFavors").

Noriega is with 800 Block. As this Court has learned and as will be established at trial, 800 Block is

CDP's strongest ally. The video prominently features unindicted CDP member Ijeoma Ogbuagu, also

known as "Drama." It also features CDP member Baxter Bradley ("Bax"), and 800 Block members

Benjamin Bautiste ("Bizzy"), and Anthony Galasi ("Frost"). Indeed, defendants Adrian Gordon ("Titty-

boy"), Charles Heard ("Cheese") and Esau Ferdinand ("Honey") are specifically referenced as allies in

the following lines, along with unindicted CDP member Vernon Carmichael ("Vito"), deceased CDP

members Julius Hughes ("Ju Bang") Frederick Maye ("Bonez"), and CDP member Gregory Walker

("Fella"), who is in prison on another federal case:

> Still fuckin' around with Titty-boy and Vito, Free Cheese, I don't know you, heard a lot, nigga,
> But I know you meant a lot to the block, nigga, Free the Mack, free the Gunna, free the Honey,
> And the wait is almost over for Ro Money, R-I-P to Ju Bang, rip Bonez, nigga, Lost hope cause
> all the good niggas gone, nigga, Free Fella, free Smooth, before my niggas leave, I tell 'em be
> smooth,

There is little question, and the government's witnesses will explain, this song is about the instant

federal case against the defendants. The video was uploaded to YouTube on April 7, 2014, a few

months after the January 9, 2014 indictment in this case. The following lyrics offer a few examples of

this:

> Bad dreams that the feds gonna come to me, You in the hood without a hustle, that ain't nothin'
> to me, The streets taught us how to trap like a double-team, Hunnid Favors, boss nigga,
> gentleman, R-I-P to K-I the middleman, Used to be a broke nigga, I was little then, Cause ever
> since a teenager, I've been gettin' it in,

Finally, the following lines specifically reference a government cooperator in this case, who is going against the "code" by testifying against CDP as a government witness:" Seen a nigga shake a hand, but he ain't a friend, Say you're loyal to your man, but you take the stand, You niggas goin' against the code, I don't understand."

### 2. "Anxious" Audio

Anxious is sung by unindicted CDP member Ijeoma Ogbuagu, a.k.a., "Drama." In the song, as witnesses will testify, Ogbuagu thanks the members of CDP (e.g., Julius Hughes, Esau Ferdinand and Vernon Carmichael, a.k.a., "Vito" who "looked-out" for him while he was incarcerated in the following lyrics:

> Sittin' on my bunk, like fuck I need to get out, Rollin' up this weed in papers, havin' to look-out, She was havin' a cookout, other niggas looked-out, When I was in the hole, freezin' tryin' to get a bed-roll, Now I'm in the streets grindin', tryin' to get a Lambo, I be out in Vegas fuckin' bitches from my Lando, And when I came home, workin' and grindin',Vito picked me up and said it's perfect timin', Sat in a chair with tapers and fresh linin',

Ogbuagu also repeatedly taunts rival gang KOP. Like CDP, certain members of KOP make and post rap songs online to communicate with each other and to intimidate rivals. In the following lyrics, Ogbuagu raps that he drives through KOP neighborhood armed and no one dares approaches him:

> Yeah I'm in the streets with straps and like rhymin', half you rap niggas out here be really lyin', Acting like you got it, you ain't never had it, You ain't never in your hood, I be in and out of traffic with the semi-automatic, Catch a nigga slippin', them hoes is phone pippin', I play for long distance,

Finally, Ogbuagu gives credit to his fellow gang members—namely defendants Heard ("Nip"), Tony Gilton ("Eunice"), Barry Gilton ("Prell"), Ferdinand ("the Honey"), Williams ("Relly"), who were all in custody on state charges that have now been incorporated in this case.[3] He also mentions CDP members Michael Northcutt ("Cutt") and Gregory Walker ("F" or "Fella") who were incarcerated in other cases in the following lines: "Free Nip, Free F, Cutt, the Honey, Relly, Eunice, Prell. All my other niggas, nigga." He then references defendant Young's music production label "Bloodwork."

### 3. "Poundcake" Audio

Poundcake is yet another song by unindicted CDP member Ijeoma Ogbuagu, a.k.a., "Drama."

---

[3] The song was uploaded to YouTube on June 16, 2013.

The song was uploaded to Soundcloud in 2014. In it, Ogbuagu references the slaying of KOP member Donte Levexier by Adrian Gordon, Esau Ferdinand and Vernon Carmichael ("Vito"). A government witness will testify that Levexier had a price tag on his head that Gordon collected:

> Tit made thousands, Bizzy made thousands, talkin' real thousands, we shoppin' you niggas browsin', Chasin' a hundred M's to get it, we all wildin. Vito copped a foreign, Gucci that boy stylin'

Ogbuagu then goes on to taunt KOP:

> See my mama smilin', happy that I made it home, when I was gone I heard you faggots was happy, I'm back out here, so tell them niggas get at me,
> Hit the corner had you niggas runnin' like a track meet,

In the following lines, Ogbuagu also references defendants Heard ("Cheese") and Ferdinand ("Sauce") who is reputed to have committed the brutal murder of Deonte White via a shot to the head for which he has never been charged: "*Cheese had Glocks, Roog had Glocks, Sauce had Glocks and a head shot, For a couple dollars my niggas will make your bed rock.*" "Roog" is Ronnie Louvier, a member of 800 Block who was formerly CDP.

At one point in the song, Ogbuagu raps about having a "gang of money" with his "whole damn team." The evidence will show that "GOM" or "gang of money" is a handle that numerous CDP members used on social network accounts—including Adrian Gordon, Vernon Carmichael, Baxter Bradley, Ijeoma Ogbuagu and 800 Block members Kevin Lewis ("K-40"), Anthony Galasi ("Frost") Bradley Shelton associate Sherwin Noriega. All of these individuals were together with multiple firearms for Overt Act ii in the Second Superseding Indictment.

### 4.   "Big Bank" Video

The government seeks to introduce this video as enterprise evidence. The rapper, San Quinn, is from Fillmore. Witnesses will testify that the video has become a famous source of pride for members of CDP. The video prominently features CDP members Alfonzo Williams, Barry Gilton, Wendell Owens, Leon Parker, Frederick Maye, Bernard Peters, and Marzette Parker throughout the video. It also prominently features CDP member Marcel Gilton, and CDP associate Dean Maye. The majority of the video is set in two locations which served as CDP headquarters: 1458 Grove Street and Da Pit (where CDP members often hid firearms). In the song, the symbol for "Uptown" ("two fists connected like a bridge) is made. Government witnesses will testify that the following lines of the song reference the

slaying of KOP member Jelvon Helton and CDP's rivalry with KOP:

> Throw a party for a nigga then he need arrangements, We was a underdogs not considered very dangerous, Yeah I rock with Wreck, and talk to Silo, Rest in Peace D-Sess, that was my bro, My cousin's baby daddy, Chanelle and Nate daddy, I ain't fucking with friends, man it's all family, From 2 Rock to Big Block get your wig rocked, Dropping off a thousand twenty shots in a zip lock.

The government's witnesses will testify that the above references Jelvon Helton, who was gunned down while celebrating the Giants' World Series win in November 2010.[4] Two Rock references Double Rock, where Helton lived. "Wreck," "D-Sess" and "Silo" are members of KOP—one of whom is dead and one of whom was sentenced to life in prison before the CDP/KOP feud began—who were still considered cool by CDP members. In the video, San Quinn raps about defendant Williams, a.k.a., "Fonzo" trafficking narcotics and handling firearms as defendant Williams prominently handles a stack of money and holds his fingers up in the background—clearly assenting to the words spoken about him. *See* FRE 801(d)(2)(A) and (B).

> Bitch wanna fuck she's gotta pay the fee I'm trying to make another million, Strictly for the re-up, Got the oxycontin poppin' up to Washington, In Seattle central district gonna rock with him, Welcome home T-fats, you a solid nigga, A hundred million for our family yeah I promise nigga, Still me and Fonzo, like it's '97, On Gran-Mommy's stairs, MAC-10, MAC-11, In the town westbound, with cousin Ann and Jackie, Three cars, ten wallys cause you niggas tacky, Two hundred thou in Chase Morgan, all legit money, Pimp money, brick money, and you ain't taking shit from me…

### 5. "Ridin With Dat 5th" Video

Tyrice Ivy, a.k.a., "TySkerz" is a member of CDP. The government seeks to introduce this video as enterprise evidence. It prominently features 1458 Grove Street—CDP headquarters—as well as CDP members Jaquain Young, Leon Parker, Vernon Carmichael, Donevan Noordzee and Clifton Salmer. Several firearms are prominently displayed throughout the video. For example, Ivy is shown in the video inside 1458 Grove Street (CDP headquarters) with a Mac-10 firearm. The song was uploaded to YouTube on December 20, 2011. In the song, Ivy references the October 2011 slaying of KOP member Donte Levexier in the following lyrics: "Killed the bitch brother now I'm fucking on his sister." Witnesses will testify that Ivy dated Levexier's sister for a period of time.

### 6. "Strictly Pimpin" Audio

---

[4] The video was uploaded to YouTube on June 28, 2011.

As discussed below, in this song, written and recorded by Jaquain Young, he repeatedly uses the same language he used with the undercover officer and with various prostitutes on text messages—instances where he is clearly discussing pimping. The song is clearly about Young's involvement in the business of prostitution, which is one of the principal ways the enterprise made money. Indeed, defendant Young directed the UC to listen to his songs on the internet. The song is also highly probative of his state of mind.

### 7. "Real One" Video

The government seeks to introduce this video by CDP ally Sherwin Noriega ("HunnidFavors"), which was uploaded to YouTube in March 2014, two months after the indictment in this case. The entire first half of the song concerns a government cooperating witness. Threats to murder this witness are repeatedly made against this witness in the song.

### 8. "Racks" Video

The government next seeks to introduce this video by CDP ally Sherwin Noriega ("HunnidFavors") which was uploaded to YouTube in September 2011. The video prominently features defendant Monzell Harding, unindicted CDP member Baxter Bradley ("Bax"), now deceased 800 Block member Ikenna Uwakah ("K.I."), 800 Block member Anthony Galasi ("Frost"). The video also features these individuals handling firearms. The lyrics reference unindicted CDP member Vernon Carmichael, also known as "Vito." The lyrics further reference "RIP Chedda Boy"—deceased CDP member Aubrey Abrakasa. The Court may recall that defendant Harding has a distinctive tattoo on his hand that says "RIP Chedda Boy." These images and statements are probative of the existence of the CDP enterprise. They further show that 800 Block is an ally of CDP—which will corroborate the testimony of the government's witnesses.

### B. Videos to Be Played (Mostly) Without Audio

There is a subset of videos that show the defendants associating with each other, with other members of CDP and with other "Uptown" allies. These videos feature firearms and include the following (individuals and respective gang affiliation/monikers noted below): (1) Still in the Hood [5;] (2)

---

5 "Still in the Hood" featuring: Jaquain Young (Loc) – CDP; Vernon Carmichael (Vito) – CDP; Leon Parker (Pooky Ray, Duke) – CDP; Alfonzo Williams (Fonz, Relly) – CDP; Antonio Gilton (TG) – CDP; Michael Northcutt (Cutt) – CDP; Esau Ferdinand (Sauce, Honey, Kid) – CDP; Dennis Anderson (Gigs)

Loud Thoughts[6;] (3) Gangstas on Grove[7] (chorus only).

The government does not seek to introduce any lyrics from "Still in the Hood" or "Loud Thoughts," but will instead play the videos without audio to show the defendants together, with other co-conspirators and, where applicable, with firearms. It is well-established that circumstantial evidence, such as evidence of association and the nature of the relationship between co-conspirators, "is often the strongest evidence of conspiracy." *United States v. Robinson*, 978 F.2d 1554, 1562 (10th Cir. 1992). Indeed, federal courts of appeals have consistently allowed evidence of the fact and nature co-conspirators' association to establish the formation, agreement, and purpose of a conspiracy. *See, e.g., United States v. Conners*, 825 F.2d 1384, 1390 (9th Cir. 1987) (proof of co-conspirators association prior to alleged conspiracy to transport into the United States from Canada more than $10,000 in U.S. currency without filing a Customs declaration was relevant to show their association and as circumstantial evidence that they acted in concert and planned criminal activities); *United States v. Normandeau*, 800 F.2d 953, 956-57 (9th Cir. 1986), overruled on *Apprendi* grounds, *United States v. Nordby*, 225 F.3d 1053, 10059 (9th Cir. 2000).

With respect to "*Gangtas on Grove*," however, the government seeks to play the chorus and introduce the images from the video to show association and as general enterprise proof. The lyrics for the chorus are "Gangstas on Grove, D-Street to Buchanan." Witnesses will testify that this references CDP territory (D-Street and Grove) and 800 Block territory (Grove and Buchanan).

## C. Defendant Young's Statements in "Strictly Pimpin" Are Party Admissions

Rap videos of a defendant's own statements are not hearsay and are admissible under Federal Rule of Evidence 801(d)(2)(A). They are defendant's own statements offered against the defendant and

---

– Chopper City; William Crawford (Ya Boy).

6 "Loud Thoughts" featuring: Leon Parker (Pooky Ray, Duke) – CDP; Adrian Gordon ("Tit") – CDP; Ijeoma Ogbuagu ("Drama") – CDP; Vernon Carmichael(Vito) – CDP

7 "Gangstas on Grove" featuring: Jaquain Young (Loc) – CDP; Vernon Carmichael (Vito) – CDP; Leon Parker (Pooky Ray, Duke) – CDP; Frederick Maye (Bonez) – CDP – DECEASED; Julius Hughes (Ju) – CDP – DECEASED; Gregory Walker (Fella) – CDP; Darius Jordan (Smooth) – 800 Block; Duane Blazer (Blaze) – 800 Block; Kevin Lewis (K-40) – 800 Block; Christopher Jackson (YC) – 800 Block; Ikenna Uwakah (K.I.) – 800 Block – DECEASED; Kameron Hayes – 800 Block; Sherwin Noreiga (HunnidFavors, Sherm) – 800 Block; Marzette Parker (Coop) – Page Street; Shaquille Johnson (Shaq) – 800 Block; William Crawford (Ya Boy); Isiain Johnson-Marin (E-Gunna) – 800 Block; Richard Bougere (Big Rich) – 800 Block; William Eason – 800 Block; Ramon Hill – Page Street.

are admissible.  In his song "Strictly Pimpin," defendant Young boasts that:

> My attitude to be a pimp, I walk around town with a fuckin' gangster limp, And never sit to these **motherfuckin' punk hoes**, My attitude is pimpin' and all is told, been exposed, **The game is played and all I got is conversation**, So bitch you know it ain't no fuckin' hesitation **all across the damn nation**, Girl you could get your Betty on, me and you baby doll, drippin' ham bones, … Let's **lace them boots**, for the cash let's go, I'm all across the nation, It keeps me motivated, cause when you in it it's like a business…

These lyrics are evidence of his state of mind.  They are further admissions that he is a pimp.  He makes similar statements in his phone calls and messages with the UC.  He further used similar language in his text messages with other women—some of whom already worked for him as prostitutes and some he was trying to recruit.  For example, in his conversations with the UC, Young texted her that: "We goin to talk in person ...**game is to be sold not told** ...so with that said ..come & let me show you the rulez & regulations so I can **lace your boots up** ..."

As to the lyric about pimping "all across the damn nation," this was a very real intention for Young.  In a recorded call with the UC, he discusses taking her from "state to state, block to block" prostituting herself.  An in a text to one of his prostitutes, Young said: *"U need too ..u might make it to this good old age **lace your boots up**"* In a text to yet another prostitute, defendant Young wrote: *"I guess how many dude have u been wit ..they **never laced your boots up** and told u around this game we call life…or was it just a sexual thang between y'all ...or do u fuck with squares cus I cant break real game down to a square ..unless she tryin to get it"* In another example, as part of a text message exchange with yet another woman, defendant Young states: "...I'm nt worried about punk bitches I'm bout to do this music shit & get my own money fuck dealing with these fake ass cry babies ass punk bitches…"   Finally, the song references CDP territory: "And the filthy Moe is where it's located, bendin' corners around Divis, Forever paper chasin', or flippin' ice…"

In short, the statements defendant Young makes in his song are party admissions that corroborate his statements to the UC and to other women.  They are further probative evidence of the enterprise and the territory it claims.  Finally, it is highly probative that the song was uploaded to Soundcloud in 2012, the same time period he was communicating with the UC.  In fact, in August 2012, defendant Young directed the UC in this case to listen to the Strictly Pimpin song on the internet.

**D.    The Remaining Songs Admissible As Co-Conspirator Statements**

The songs by CDP members Ogbuagu and Tyrice Ivy, as well as the songs by the members of 800 Block are all admissible as co-conspirator statements pursuant to FRE 801(d)(2)(E). The evidence will establish that CDP members are featured and/or referenced with affection in these songs. The testimony of the government's witnesses will further establish the close alliance between CDP and 800 Block. A statement is not hearsay if "the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); *see also, Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The statement of a co-conspirator is admissible if the court finds by a preponderance of the evidence that: (1) a conspiracy existed at the time the statement was made, (2) the defendant knowingly participated in the conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy. *See United States v. Liera*, 585 F.3d 1237, 1245-1246 (9th Cir. 2009); *United States v. Bowman*, 215 F.3d 951, 960-61 (9th Cir. 2000). The government cannot establish knowing participation "rely[ing] solely on the alleged co-conspirator statements themselves," *Liera*, 585 F.3d at 1246, but need present only slight evidence connecting the defendant to the conspiracy, *United States v. Mason*, 658 F. 2d 1263, 1269 (9th Cir. 1981). The requirements of Rule 801(d)(2)(E) and the Confrontation Clause of the Sixth Amendment are identical. *Bourjaily*, 483 U.S. at 182-84.

Finally, it is significant that a conspiracy need not be charged to introduce a co-conspirator's statements. *United States v. Portac, Inc*., 869 F. 2d 1288, 1294 (9th Cir. 1989). Participation as an aider and abettor suffices, as a concert of action creates a conspiracy for purposes of the evidentiary rule. *Id*. A statement is "in furtherance" of a conspiracy if it furthers the common objectives of the conspiracy or sets in motion transactions that are an integral part of the conspiracy. *United States v. Layton*, 720 F. 2d 548, 556-57 (9th Cir. 1983). In determining whether a statement was made "in furtherance of" a conspiracy, the focus is not on its actual effect in advancing the goals of the conspiracy but rather on the declarant's intent in making the statement. *United States v. Zavala-Sierra*, 853 F.2d 1512, 1516 (9th Cir. 1988). Accordingly,

> [w]hen a declarant seek[s] to induce [the listener] to deal with the conspirators or in any other way to cooperate or assist in achieving the conspirators' common objective, the declaration may be admissible [as a co-conspirator statement]. Statements concerning activities of the conspiracy, including future plans, also may become admissible when made with such intent.

*United States v. Foster*, 711 F. 2d 871, 880 (9th Cir. 1983). Statements made to induce enlistment or further participation in the group's activities are considered to be in furtherance of the conspiracy, as are statements to prompt further action, to allay fears or reassure members of a conspiracy's continued existence, and to keep co-conspirators abreast of an ongoing conspiracy's activities. *See United States v. Yarborough*, 852 F.2d 1522, 1535-36 (9th Cir. 1993); *United States v. Crespo de Llano*, 830 F.2d at 1543. Acts of concealment may also be in furtherance of the conspiracy. *See United States v. Stinson*, 647 F.3d 1196, 1215-16 (9th 2011).

There is no further requirement in the relevant case law that the person to whom a statement is made be a member of the conspiracy in order for the statement to be admissible under Rule 801(d)(2)(E). *See, e.g., United States v. Martinez*, 657 F.3d 811, 816 (9th Cir. 2011) ("Part of the evidence against Valenzuela was the statement of Raul Leon, a Mexican Mafia member incarcerated at Pelican Bay prison, made to another prisoner and referring to Barragan, 'He was saying he was a Carnal. So as soon as he got up there to the High Desert, I had his ass killed.' The statement was admissible as that of a coconspirator advancing the conspiracy's aim to maintain power in the prisoners. Valenzuela's objection to admission of the statement is meritless. Valenzuela also objects to testimony of another inmate that Abarca told this inmate to spread the word to Pelican Bay that 'the job was done,' a message calculated to enhance the power of the conspiring [sic] and therefore also admissible under Rule 801(d)(2)(E)."). *See also United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993) (affirming admission of statement "not made to a coconspirator"); *United States v. Lujan*, 936 F.2d 406, 410 (9th Cir. 1991) (analyzing only coconspirator status of declarant); United States v. Garcia, 16 F.3d 341, 342, 344 (9th Cir. 1994) (statement made to undercover agent). Tellingly, the panel in *United States v. Bowman* affirmed the admission of statements under Fed. R. Evid. 801(d)(2)(E) made by the defendant to his girlfriend despite the retrospective nature of the statements because they were needed in order to get his girlfriend to help him. *See United States v. Bowman*, 215 F.3d 951, 960-61 (9th Cir. 2000) ("Penney [the girlfriend] had to know Kirkpatrick was a bank robber in order to help him.").

In determining whether the requirements of the co-conspirator rule have been met, the Court can rely on any relevant evidence, whether admissible or not. *Bourjaily*, 483 U.S. at 175 ("[T]he judge should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay."). Such

evidence may include, for example, hearsay evidence, evidence not admitted in the trial, and the co-conspirator statements themselves. *Id.* at 178-79 ("Out-of-court statements made by anyone, including putative co-conspirators, are often hearsay. Even if they are, they may be considered . . . ."). A trial court has discretion to vary the order of proof in admitting a co-conspirator's statement; the statement may be admitted prior to the presentation of independent evidence of the conspiracy. *United States v. Loya*, 807 F. 2d 1483, 1490 (9th Cir. 1987).

Evidence short of proof of the commission of the substantive offense is sufficient to prove the defendant's knowing participation in the conspiracy by a preponderance of the evidence. *United States v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988). In determining whether a conspiracy exists, the court may consider the co-conspirator's statements themselves, but those statements alone do not conclusively establish the existence of the conspiracy. *United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir. 1990).

The songs "Anxious," "Poundcake," and "Ridin Wit Dat 5th" are sung by members of CDP. Specifically, testimony by the government's witnesses at trial will establish that Ogbuagu and Ivy are members of CDP. The remaining songs—"Neva Luhhed Us," "Racks" and "Straps on Straps" are performed by a member of 800 Block—CDP's closest ally and undoubted co-conspirator. The two gangs have been close allies for more than 10 years. Evidence at trial will establish that they frequently committed crimes together and went after common enemies. The existence of this conspiracy will be established by the government's witnesses. Each of the proffered songs by 800 Block includes CDP members, discuss the instant federal case and make threats against CDP rivals. They therefore further the aims of the criminal conspiracy.

### E. Such Evidence is Generally Admissible

Throughout the country, rap lyrics, recordings, and videos are generally admissible to prove gang membership or affiliation, criminal intent, and related matters. In *United States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001), for example, a criminal prosecution stemming from the burning of a cross on an interracial family's property, the Tenth Circuit upheld the admission of racist song lyrics by the band "Screwdriver" when the evidence showed that the defendant knew and sang those lyrics. Even though the defendant was neither the writer nor the singer, it was probative evidence of his intent and his racial animus. *Id*. at 1318-19. In *United States v. Belfast,* as another example, the defendant was

prosecuted for committing numerous acts of torture, as well as firearms offenses, as part of the militant group "ATU" or "Demon Forces" in Liberia. 611 F.3d 783, 820 (11th Cir. 2010), *cert. denied*, 132 S. Ct. 1511 (2011). The Eleventh Circuit upheld the district court's admission of rap lyrics found in a notebook in the defendant's suitcase at the time of his arrest. The lyrics were as follows:

> Take this for free, six feet is where you gonna be. ATU niggas on the scene. Body bag is all you see"; "More sweat in my training means less blood in my life. So with the shots from guns keep it dead and precise. Bull-doze ambushes in the midst of a fight. Try to cut my supply, you'll be losing your life"; and "army thugs united."

611 F.3d at 820. The Eleventh Circuit held that the lyrics were probative "on multiple fronts." *Id*. They provided evidence of the defendants association with ATU and they were also probative of the violence with which he was charged.

In *United States v. Montes*, 421 F. App'x 670, 673 (9th Cir. 2011), the Ninth Circuit upheld the district court's admission of a music video against defendants charged with conspiracy to possess and distribute marijuana. Similarly, in *United States v. Foster*, the Seventh Circuit held that the rap lyrics, "key for key, pound for pound I'm the biggest dope dealer and I serve all over town. Rock 4 Rock Self 4 Self. Give me a key let me go to work more dollars than your average business man," were admissible under Rule 404(b) for the purpose of showing that the defendant was "familiar with drug code words and, to a certain extent, narcotics trafficking." 939 F.2d 445, 455-57 (7th Cir.1991). In *United States v. Stuckey, III*, 74 Fed. R. Evid. Serv. 1132 (6th Cir. 2007) (unpublished), the Sixth Circuit approved the introduction of the defendant's rap lyrics which included statements that the defendant dislikes and kills "snitches," fills their bodies with holes, wraps them in blankets, and dumps them in the road as direct evidence that the defendant had shot a government witness wrapped his body in blankets, and dumped it in the road. The Court reasoned that "Had Stuckey rapped, 'I shot Darbins, wrapped him in a blanket, and dumped him in the road," the lyrics would clearly be admissible evidence just as if he had made the same statements to a third party."

There are numerous other examples. *See United States v. Herron,* 2014 WL 1871909, at *3 (E.D.N.Y. May 8, 2014) (videos showing the defendant "identifying as a member of the Gowanus-based Murderous Mad Dogs, conversing with alleged gang associates, firing weapons, vowing retaliation after an alleged associate is shot by a rival, and bragging that other people will do his bidding" were relevant

because "the Government must prove the existence and structure of an alleged criminal enterprise and a pattern of criminal activity committed in furtherance of that enterprise"); *United States v. Moore*, 639 F.3d 443, 447–48 (8th Cir. 2011) (holding recordings of defendant rapping about drugs were admissible and not unduly prejudicial) (citing *Belfast*, 611 F.3d at 820); *United States v. Stuckey*, 253 F. App'x 468, 491 (6th Cir. 2007) (holding rap lyrics by defendant admissible because their probative value in showing his gang affiliation "was not substantially outweighed by any danger of unfair prejudice"); *Zepeda v. Hubbard*, 2013 WL 1832693 (E.D. Cal. May 1, 2013) ("[F]ederal courts have repeatedly upheld the admission of arguably prejudicial rap lyrics, recordings, and/or videos to prove criminal intent, gang membership, and related matters.") (citing *Moore* and *Belfast*); *McDonald v. Haws*, 2011 WL 768130 (S.D. Cal. Feb. 8, 2011) (music video admissible because it established defendant's association with co-conspirator) and *Pule v. Hedgpeth*, 2011 WL 6056921 (C.D. Cal. Oct. 11, 2011) (defendant's music video admissible because it "tended to show his membership in the SOS gang and his devotion to the gang and its activities."); *Martin v. Biter*, 2012 WL 846451 (C.D. Cal. Feb. 7, 2012)(upholding admission of rap lyrics sung by defendant in jail call as probative of state of mind in first degree murder cases).

### F.     The Video and Audio Evidence is Not Unduly Prejudicial

The proposed video and audio evidence is not unfairly prejudicial.  The Court must evaluate the proffered evidence in the context of the conduct alleged in the indictment, and should not exclude evidence as unduly prejudicial when it is not "more inflammatory than the charged crime[s]."  *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999); *see also United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (noting evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged" (alteration in original)).  Here, the Second Superseding Indictment charges the defendants with, among other offenses, multiple murders; sex trafficking; attempted sex trafficking of a minor.  It also alleges pimping; obstruction of justice; and various firearms offenses.  There simply is no basis to conclude that a series of video excerpts in which the defendants and others discuss drugs, violence, prostitution and display weapons will unduly prejudice the defendants' case, much less that such prejudice would substantially outweigh the probative value of the evidence.  *See, e.g., United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (upholding

1    admission of uncharged murders as proof of existence and nature of the RICO enterprise and concluding

2    probative value of the evidence was not substantially outweighed by its potential for unfair prejudice);

3    *Herron*, 2014 WL 1871909, at *3 ("While it is true that the videos contain profanity, misogyny, and

4    references to violence that viewers could find objectionable or shocking, it cannot be said that their

5    content is 'more inflammatory' than the charged crimes" of murder, narcotics trafficking and weapons

6    possession).

7            The defense will doubtless argue that the videos are fictional content that celebrate the so-called

8    "gangsta lifestyle" but do not reflect reality.  As previewed above, the evidence at trial will prove

9    otherwise.  More importantly, the defendants will be free to present such arguments to the jurors, who

10   will be able to decide for themselves whether to credit this view of the evidence.  Making such

11   assessments is precisely the function of the jury.  *See, e.g., Coleman v. Johnson*, 132 S. Ct. 2060, 2064

12   (2012) (observing that juries have "broad discretion in deciding what inferences to draw from the

13   evidence presented at trial" so long as they "draw reasonable inferences from basic facts to ultimate

14   facts" (internal quotation marks omitted)); *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)("The First

15   Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to

16   prove motive or intent."); *see also Dawson v. Delaware*, 503 U.S. 159 (1992) ("[T]he Constitution does

17   not erect a per se barrier to the admission of evidence concerning one's beliefs and associations . . . .").

18           Finally, each of the rap videos and/or songs the government seeks to introduce is admissible as

19   inextricably intertwined with the crimes charged in the Second Superseding Indictment.  Evidence

20   should not be considered "other crimes" or "other act" evidence within the meaning of Rule 404(b) if

21   "the evidence concerning the 'other' act and the evidence concerning the crime charged are inextricably

22   intertwined." *United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012) (citing *United States v.*

23   *Soliman*, 813 F.2d 277, 279 (9th Cir. 1987); *United States v. Martinez-Rodriguez*, 472 F.3d 1087, 1091

24   (9th Cir. 2007) ("Rule 404(b) does not exclude evidence forming an essential element of the charged

25   crime.").  Evidence of other acts is inextricably intertwined when (1) it constitutes a part of the

26   transaction that serves as the basis for the criminal charge, or (2) it helps the prosecutor offer a coherent

27   and comprehensible story regarding the commission of the crime.  *United States v. DeGeorge*, 380 F.3d

28   1203, 1220 (9th Cir. 2004).

**XI.** **Motion *in Limine* No. 11: The Defendants Should be Precluded from Referencing Punishment or Introducing Argument or Evidence of Previous Charging Decisions.**

The government moves to preclude, as irrelevant and prejudicial, any reference by the defense to the defendants' potential sentence or previous sentences during all phases of the trial (including jury selection, opening statements, examination of witnesses, including the defendant if he elects to testify, and summation). References to penalties could be as overt as "You understand the defendant is facing years in prison if convicted," or "the defendant has already been sentenced and imprisoned for this offense." Such references could also be more subtle, such as "the defendant has been punished enough," "the defendant is facing a lot of time," "this case has serious consequences for the defendant," "the defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to come." Once the jury hears anything about punishment, the "bell" simply cannot be un-rung or the damage neutralized by a curative instruction.

"It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992). This rationale extends with equal force to previous punishments. As explained in *Pope v. United States*, 298 F.2d 507 (5th Cir. 1962):

> To inform the jury that the court may impose minimum or maximum sentence… or other matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.

*Id.* at 508; *see also Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion"); *Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should have been admonished that it "had no sentencing function and should reach its verdict without regard to what sentence might be imposed"); *United States v. Reed*, 726 F.2d 570, 579 (9th Cir. 1984) (punishment "should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused.").

Providing the jury with information about the consequences of a jury's verdict or previous punishment invites jury nullification and confuses the issues to be decided. *United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995). Put simply, "it is inappropriate for a jury to consider or be informed of

the consequences of their verdict." *Frank*, 956 F.2d at 879. The Ninth Circuit has also recognized this principle in its model instructions. Ninth Cir. Model Crim. Jury Instr., § 7.4 (2014) ("The punishment provided by law for this crime is for the court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.")

Asking the Court to preclude the defense from referencing punishment to the jury is not a mere academic exercise. There is only one reason why the defense would want the jury to hear information about a prior sentence or the sentence that a defendant might face if convicted: to hope that at least one juror will think that the potential sentence that the defendant faces is too long or that the defendant has already been punished enough and, as a result, that at least one juror will acquit the defendant or refuse to convict him even though he is guilty. The Court should therefore prohibit the defense from making reference to any punishment in the presence of the jury at any point during trial.

Similarly, the defendants should not be permitted to question witnesses or make any reference at trial to the San Francisco District Attorney's or another prosecutor's decision to charge (or not charge or dismiss) any of the defendants with certain crimes – including gang enhancements. A prosecutor's decision to pursue and resolve certain charges and not others is completely irrelevant to guilt or innocence in the federal case. To allow such information to be injected into the defendants' trial invites error and prejudice. For reasons similar to those described above precluding reference to punishment, the defendants should be prohibited from making reference to or introducing any evidence concerning the charging decisions of any prosecutor's office.[8]

**XII.  Motion *in Limine* No. 12:  Fed. R. Evid. 609 Allows the Use of the Defendants' Prior Convictions for Impeachment.**

The government will seek a ruling to allow the government to impeach the defendants with prior convictions if they testify. Evidence of a defendant's prior felony convictions "must be admitted . . . if the probative value of the evidence outweighs its prejudicial effect." Fed. R. Evid. 609(a)(1)(B). Thus,

---

[8] *See* Fed. R. Evid. 103(d) ("the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means."); Fed. R. Evid. 403 (court may exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury); Fed. R. Evid. 408 (prohibiting admission of compromise offers and negotiations); *Bordenkircher v. Hayes*, 434 U.S. 357, 367, n.6 (1978) (prosecutor's decision not to seek more serious charges is discretionary).

under Rule 609, any felony conviction, regardless of whether it involves truth telling, may be used to impeach the credibility of a testifying defendant, so long as the conviction, or release from confinement for the conviction, is not more than 10 years old. *See* Fed. R. Evid. 609(b); *United States v. White*, 463 F.2d 18, 20 (9th Cir. 1972); *United States v. Michaelson*, 453 F.2d 1248, 1249 (9th Cir. 1972); *Nutter v. United States*, 412 F.2d 178, 181-82 (9th Cir. 1969).

The Ninth Circuit has outlined five factors that courts should consider in balancing the probative value of a prior conviction against its prejudicial effect: (1) the impeachment value of the prior crime; (2) the time of the conviction and the defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility. *United States v. Cook*, 608 F.2d 1175, 1185 n.8 (9th Cir. 1979) (en banc), *cert. denied*, *Luce v. United States*, 469 U.S. 38 (1984); *United States v. Hursh*, 217 F.3d 761, 768 (9th Cir. 2000). Should any of the defendants testify, the government will seek to impeach the testifying defendant with evidence of their qualifying felony convictions.

Although it is difficult to analyze the admissibility of the defendants' convictions prospectively under the five-factor test set forth in *Cook* (in part because factors four and five—the importance of the defendant's testimony and the centrality of the credibility issue—have not yet materialized), should any of the defendants testify, the government will seek to use the testifying defendant's felony convictions for impeachment under Rule 609 and believes that it will be appropriate to do so under the *Cook* factors.

## CONCLUSION

For all of the foregoing reasons, the Court should rule as set forth above if and when the issues identified arise. The government would respectfully reserve the right to supplement these motions *in limine* if later presented with additional issues requiring the Court's intervention.

DATED: April 8, 2016

Respectfully submitted,

BRIAN J. STRETCH
United States Attorney

_____/s/_____
DAMALI TAYLOR
WILLIAM FRENTZEN
SCOTT D. JOINER
Assistant United States Attorneys