JOHN R. GRELE (Bar. No. 167080)
LAW OFFICE OF JOHN R. GRELE
1 Blackfield Dr., #158
Tiburon, California 94920
Telephone: (415) 888-8912
Facsimile: (415) 484-7003
jgrele@earthlink.net

Attorney for Defendant
ALFONZO WILLIAMS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiffs,<br><br>v.<br><br>ALFONZO WILLIAMS,<br><br>              Defendant. | CASE NO.  CR-13-0764-WHO<br><br><br>**OPPOSITION TO GOVERNMENT'S MOTIONS IN LIMINE #4 AND #10** |

# **TABLE OF CONTENTS**

**Page**

A.    The Court Cannot Issue Blanket Proscriptions Against Officer Impeachment.  1

B.    The Rap Songs Offered by the Government Are Inadmissible……………  4

    1.    Rap Videos Are Artistic Endeavors and Not Evidence of Criminality…  5

    2.    The Government's Characterizations of Relevancy Are Unsupported….  7

    3.    Rap Videos Themselves are not Evidence of a Conspiracy………………  10

    4.    Statements in Rap Videos are not Co-conspirator Statements…………….  12

    5.    The Rap Songs are not Intertwined with the Charges…………………......  15

C.    The Government's Characterizations of the Rap Songs Does
Not Demonstrate  Relevance and Omits the Prejudicial Material…………..    15

    1.    "Neva Luhhed Us"………………………………………………….    15

    2.    "Anxious"…………………………………………………………..  16

    3.    "Poundcake"……………………………………………………  17

    4.    "Big Bank"……………………………………………………….  18

    5.    "Ridin with Dat 5th" (exhibit 8)…………………………………..  21

    6.    "Strickly Pimping Audio"………………………………………..  22

    7.    "Real One"……………………………………………………  22

    8.    "Racks" Video…………………………………………………..  23

    9.    Other Videos…………………………………………………..  23

D.    The Jury Cannot Sort Out the Rap Evidence without Extensive and Time

    Consuming Litigation and Presentation…………………………………  24

*//*

# **TABLE OF AUTHORITIES**

Cases                                                                                                    Page

*McDonald v. Haws*, 2011 WL 768130 (SD Cal. 2011)…………………………….. 13

*United States v. Belfast*, 611 F.3d 783 (11th Cir.2010)…………………………… 13

*United States v. Conners*, 825 F.2d 1384 (9th Cir.1987)…………………………… 11

*United States v. Foster*, 939 F.2d 445 (7th Cir.1991)…………………………….. 13

*United States v. Gay*, 967 F.2d 322 (9th Cir. 1992)………………………………… 2

*United States v. Herron*, 2014 WL 1871909 (ED NY 2014)……………………… 13

*United States v. Jones*, 2005 WL 348398 (9th Cir. Feb. 14, 2005)……………………… 3

*United Sattes v. Liera*, 585 F.3d 1237 (9th Cir. 2009)………………………… 12

*United States v. Magleby*, 241 F.3d 1306 (10th Cir.2001)……………………………. 13

*United States v. Monks*, 774 F.2d 945, 950 (9th Cir.1985)…………………………… 19

*United States v. Montes*, 421 Fed. Appx. 670 (9th Cir.2011)……………………… 13

*United States v. Moran*, 493 F.3d 1002 (9th Cir. 2007)………………………………… 12

*United States v. Normandeau*, 800 F.2d 953 (9th Cir.1986)………………………… 11

*United States v Olsen*, 704 F.3d 1172 (9th Cir. 2013)…………………………………… 3

*United States v. Ray*, 731 F.2d 1361 (9th Cir. 1984)……………………………… 3

*United States v. Robinson*, 978 F.2d 1554 (10th Cir.1992)……………………………… 11

*Williams v. Shaner,* 2002 U.S. Dist. LEXIS 10112 (S.D.N.Y. 2002)…………………… 2

*United States v. Stuckey*, 253 Fed Appx 468 (6th Cir. 2007)…………………………….. 13

*Zepeda v. Hubbard*, 2013 WL 1832693 (ED Cal. 2013)………………………………… 13

Statutes

Fed.R.Evid. 403……………………………………………………………….. 3

Fed. R.Evid. 608, Advisory Comm. notes (2003)………………………………….. 2, 3

Fed. R.Evid. 801(d)(2)(E)…………………………………………………… 12, 13

## DEFENDANT'S OPPOSITION TO GOVERNMENT'S
## MOTIONS IN LIMINE #4 AND #10

Defendant Alfonzo Williams, on behalf of the Group 1 defendants, submits the following

Opposition to the government's Motions in Limine #4 and #10.  This Opposition is based on

Federal Rules of Evidence 401, 402, 403, and the defendants' rights under the Sixth Amendment

to confront and impeach the officers and authors or singers of the rap songs that are the subjects

of the government's motions.

Preliminarily, the irony of the government's positions is that on the one hand, the

government objects to disclosure to the jury of allegations of racism by officers, and on the other,

it seeks to introduce evidence that has been severely criticized for appealing to racism and fear in

jurors.[1]  The government has it exactly backwards.

**A.      The Court Cannot Issue Blanket Proscriptions' Against Officer Impeachment (Govt.
         MIL #4)**

The government seeks the Court to order the defense to make a proffer of relevance for

any officer impeachment.  As the Court well-knows, officers enjoy no special status as witnesses

under Rule of Evidence 608(b)(1).  Like any other witness, if there are allegations of misconduct

relevant to impeachment, the defense is entitled under the Sixth Amendment Right to

Confrontation to use that impeachment.

The defense has no objection to proffering the relevance of impeachment as the officers

are called.  This is for the practical reason that with over 250 officers listed, it makes little sense

to argue about impeachment information that will never be an issue because that officer isn't

being called.

Another reason this cannot be done now is that the government released the material only

---

[1] The most recent jury data from this District that defense counsel were permitted to analyze disclosed a 50% comparative disparity rate in the selection of African-American jurors in this District.

recently. The defense simply hasn't had time to review it, see what is missing, move to obtain the missing material, and then make a full showing of relevance.

The government's motion does not specify any particular act or omission by a police officer that the government contends is inadmissible. *See* Doc. #974 at 4. The government thus fails to address the probative value of each incident, the prejudicial effect of the misconduct, or the nature of the proof that the impeaching incident occurred. Instead, the government relies solely on the absence of a disciplinary board finding that the incidents occurred. However, in fashioning Federal Rule of Evidence 608, the Advisory Committee explicitly intended to make such disciplinary board findings irrelevant:

> It should be noted that the extrinsic evidence prohibition of Rule 608(b) bars any reference to the consequences that a witness might have suffered as a result of an alleged bad act. For example, Rule 608(b) prohibits counsel from mentioning that a witness was suspended or disciplined for the conduct that is the subject of impeachment when that conduct is offered only to prove the character of the witness.

Fed. R.Evid. 608, Advisory Comm. notes (2003).[2]

Rather than relying on the presence or absence of an administrative finding, the Court must assess each incident and assess its probative value. Specific bad act evidence is admissible under Rule 608(b) "for the purpose of attacking or supporting the witness credibility" if it is probative of the "witness' character for truthfulness or untruthfulness" or "challenges a witness's credibility." *See United States v. Gay*, 967 F.2d 322, 327-28 (9th Cir. 1992); *see also Williams v. Shaner,* 2002 U.S. Dist. LEXIS 10112, 2002 WL 1285119, at *1 (S.D.N.Y. Jun. 6, 2002) ("Rule

---

[2] Administrative board findings might not be available for a number of reasons that do not impact on the probative value of the underlying acts of misconduct. For example, the discovery of much publicized, racially charged text messages sent by certain San Francisco Police Department officers did not result in any disciplinary findings because the City and County of San Francisco failed to file an administrative proceeding against the offending officers within the applicable statute of limitations. Of course, the County's failure to timely take disciplinary actions, whether or not accidental, does not lessen the probative value of the text messages in relation to the officers' possible racial bias.

608(b) of the Federal Rules of Evidence, however, entitles defendants to cross-examine plaintiff about whether he attempted to tamper with a witness's testimony, because such allegations plainly are probative of plaintiff's credibility.").  Evidence of specific instances of misconduct is also subject to the balancing inquiry under Federal Rule of Evidence 403. *See United States v Olsen*, 704 F.3d 1172, 1184 n.4 (9th Cir. 2013) ("Rule 608(b) of the Federal Rules of Evidence authorizes courts to permit inquiry into specific instances of conduct during cross-examination if they are probative of the character for untruthfulness of the witness - subject, of course, to the balancing analysis of Rule 403.").  Clearly, the Court must assess the probative value of each incident and cannot exclude any incident based solely on the fact a citizen's complaint was not sustained by an administrative board.[3]

In addition, some of the incidents of police misconduct that are not the subject of "sustained" administrative findings might be admissible to establish the testifying officers' bias. The use of past misconduct for these purposes is not covered by Rule 608 and must be permitted under the Sixth Amendment.  *See e.g., United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir. 1984) ("Rule 608(b) does not bar introduction of evidence to show that the witness is biased. It regulates only the admissibility of evidence offered to prove the truthful or untruthful character of a witness.");  *see also* Fed. R.Evid. 608, Advisory Comm. notes (2003) ("By limiting the application of the Rule to proof of a witness' character for truthfulness, the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment such as contradiction, prior inconsistent statement, bias and mental capacity").

The Court should direct the government to make its Rule 608(b) objections as each witness who is possibly the subject of impeachment under the rule is called to testify.  At that

---

[3] The government citation to *United States v. Jones*, 2005 WL 348398, *1-3 (9th Cir. Feb. 14, 2005) is entirely misplaced.  In *Jones*, the Ninth Circuit found that Judge Illston had erred "by precluding inquiry into events underlying unsustained citizen complaints against testifying officers" because "Cross-examination regarding conduct underlying citizen complaints about illegal searches by testifying officers would elicit relevant testimony because such conduct bears on the officers' credibility."  *See United States v. Jones*, 123 Fed. Appx. 773, 775 (9th Cir. 2005) The Ninth Circuit upheld the conviction because defendant Jones failed to "establish that the district court's exclusion of this relevant testimony prejudiced him."  *Id*. at 775-76.

point, the defense will be prepared to make proffers regarding the theory of admissibility for each incident so that the Court can make an informed ruling based on the probative value of each specific incident, rather than forcing unnecessary litigation over non-witnesses.

As for the government's burden of having to object, then rehabilitate, the defense assumes that officers are fully capable of testifying there was no merit to the allegations, if that is true.

At the end of its argument, the government tosses in that the defense should also be precluded from impeaching civilian witnesses. *See* Doc. 974 at 5. It is not clear what is meant by *Henthorn*-type material in this context. If the government means all impeachment having to do with witnesses being untruthful, that is obviously incorrect. If there is a bad act a witness has done that reflects dishonesty or motive to lie, that is fair game. For instance, if a witness against the defense took a weapon from a deceased victim at a crime scene and hid it from officers, and that weapon may naturally be considered as evidence the shooting involved self-defense, that is fair game. If a witness has a history of bad acts directed towards the defendants and is now a witness against them, with every motive to fabricate to deflect from their own misdeeds, that may be fair game as well. It will depend upon the circumstances and evidence as it is introduced.

## B.     The Rap Songs Offered by the Government Are Inadmissible (Govt. MIL #10)

The government has presented the Court with 11 rap songs and/or videos it wishes to introduce. The government's position is unique in the law: with the exception of one supposedly authored and sung by Mr. Young, not one is written or sung by any defendant. The government has to offer their own interpretation of what the songs and videos mean to this case, as very little, if any, is apparent. Some of these interpretations are so strained they are themselves reasons to exclude. No court has authorized this introduction of prejudicial material likely to inflame the passions of the jury. This Court should not be the first. Federal Rule 403 prohibits exactly what the government is trying to do here.

In general, the rap videos and songs portray "gangsta rap" that has already been the

subject of extensive briefing and argument, which Mr. Williams will not repeat here. The appeal to racial biases and prejudice is apparent not only from the videos, but from some of the justifications. They portray young African-American men with menacing movements, gestures and lyrics. They picture drugs and guns (not on any defendant). They speak derogatorily of women, other African-Americans and those who inform for the government. They contain exaggerated and grandiose statements about money, women and violence. These songs are designed for a purpose – to adopt a persona that speaks of criminality and contains derogatory references, and references and displays drugs and guns, to gain credibility as a rap artist. They are inadmissible.

To the extent the Court is inclined to permit any videos, a hearing will be required beforehand for the government to establish the relevance they claim.

`    **1.    Rap Videos Are Artistic Endeavors and Not Evidence of Criminality**

Throughout, the government seeks to portray rap videos as reality films of events that actually transpired. They are not. As Professor Kubrin tells us, they are designed to attract the attention of the music industry and fans by adopting an exaggerated gangster persona, including singing about drugs, violence and money, and the display of weapons and money.[4] If necessary, the defense will present hundreds of such videos all by persons who have nothing to do with racketeering activity, to prove this point.

A few common-sense points are worth mentioning, ones which demonstrate the government will have difficulty proving both relevance and authentication under FRE 901. Rap artists, like many performers, don't necessarily write the material they sing. Thus, we don't know if the authors of the songs are those portrayed as singing them. In rap productions, as with

---

[4] Professor Kubrin's declaration and CV have twice previously been submitted to the Court. They are incorporated herein by reference.

many music videos, we also don't know if the lyrics and vocals are actually being stated when the video is shot, or if they are overlays in the studio so that sound production is maximized. There is no representation that the individuals in the videos are identifying with the lyrics at all, as opposed to being "extras" showing up at a set for a production that will later be dubbed.[5] And, most appear to have been added to YouTube by unknown individuals who could have edited and dubbed them in any number of ways before posting. It is submitted that these production issues are yet another reason why the videos are inadmissible.

Gangsta Rap often uses violence as metaphor, and it can be plainly seen in the songs here. For instance, guns and shooting is often mixed within lyrics about rappers and rapping. Their voice is their weapon. Thus, guns and shooting are a metaphor, not an actual threat to use or use of them. Likewise, displays of money and drugs are added to demonstrate acceptance.

Finally, rap artists perhaps more than any other genre, borrow extensively from other rap artists. For instance, "Strictly Pimping", allegedly authored and sung by Mr. Young, has been a rap song by numerous artists for over a decade and was likely modeled after a serious of novels. "Poundcake" has been a song and an artist for years. "Gang of Money" has been a rap lyric since 1998. http://genius.com/Nate-dogg-g-funk-lyrics. It is a common phrase for those who have money[6]. "Big Bank", by the Bay Area's best known and most successful rapper, uses a complex interwoven lyrical structure derived from several rap artists' phrasings. This use of other's work also demonstrates that the rap songs in question are well within the genre of exaggerated

---

[5] "Big Bank" seems dubbed in this fashion as the syncing is off. Others appear to be as well.

[6] Research will show that "gang of money" is a common phrase used to somewhat derogatorily describe successful African-Americans. http://www.billboard.com/articles/columns/the-juice/42371/raekwon-talks-new-signee-jd-era-wu-tang-anniversary-plans (rapper made a "gang of money"). Thus, NBA players and rap artists are referenced as earning a "gang of money." Rap is perhaps one of the most vocal art forms that reappropriates such symbols. Sociologists explain that this process is used by oppressed groups to deprive words and symbols of their power to inflict harm.

references that Professor Kubrin describes.

**2.    The Government's Characterizations of Relevancy Are Unsupported**

Throughout, the government tends to overstate its case.  For instance, it repeats that the videos "feature" or "prominently feature" certain individuals, but do not provide specifics such as length of time or relative position.  For many of these, the defense is at a loss because although certain individuals do appear within the videos, often in very brief snippets, they are by no means "featured" or "prominent."[7]  It appears as hyperbole that is unsupported by any specifics.

Every rap the government offers barely mentions any Group 1 defendants, most not at all. While they may on occasion mention someone else, it is for the most part extremely brief. For instance, "Neva Luhhed Us" has 72 lines of lyrics (Doc. 974, ex. 2) and is 4 minutes long.  There is one brief mention each of those the artist apparently knows to be incarcerated or dead, a few of which are alleged CDP members and two of which are Group 2 defendants.   No Group 1 defendants are mentioned.

"Ánxious" has the same dynamic – a very brief reference to one unindicted co-conspirator, and simply mentioning the names of incarcerated defendants and others. (Doc. 974, at 12, Exh. 5).  There is no discussion of any criminality by any defendant.

"Associate" has taken on a new meaning in the government's eyes.  It appears to be anyone seen with CDP members.  It is up to the government to identify how association is established.  Some is obvious from the indictment and discovery, but the majority here is not. For instance, Dean Maye, Mr. Williams' uncle and basketball coach, is now an associate even though his name does not appear on the FBI's chart.  Nearly every name mentioned as associate is not on the chart, which does identify associates.  Such efforts to cast wide net to try and justify

---

[7] For instance, it is alleged that Dean Maye, Mr. Williams' uncle, is "featured."  If he is, it is extremely briefly.  He is the owner of the 1548 Grove St. house, which is the only remaining Africa-American owned home on that block (which is why it is used in videos).

admissibility only backfire and prove the defense's point.

"Associates" being the authors presents an additional problem that is insurmountable. The three (3) videos by Noriega; the two (2) by Crawford; and the one by Galasi all fit within this category. Thus, of the 11 videos, 6 aren't by or about CDP members. In fact, two (2), are not even by alleged gang members (Quinn, Crawford). It is hard to imagine a more tenuous tie to the charges than rap videos by members of other gangs or non-gang members that merely mention names of CDP members, or happen to have alleged CDP members in them doing nothing criminal other than standing around as props in a video.

Thus, the government's representation that "each of the songs" is "rapped by a member or associate of CDP is not supported by its descriptions of seven (7) of the videos. For instance, Quincy Brooks (aka San Quinn), the rapper for the song "Big Bank", is not a member or associate, according to the FBI's own chart, and the lack of any A file on him. The best the government can say is that he is "from Fillmore." Doc..974, at 13. He grew up across the street from Mr. Williams and they have known each since they were young children. Their grandmothers were friends. He has authored and appeared on over 50 rap albums and is perhaps San Francisco's best known rap artist. https://en.wikipedia.org/wiki/San_Quinn. Apparently, "associate" means any African-American male who is from the same neighborhood and is or was friends with anyone alleged to be in CDP. [8]

The same is true of Sherwin Noriega. He is not a CDP member, or associate, but an alleged "ally" who is "with" 800 Block. Doc. 974, at 11. "With" a gang is a new category of relationship that is not explained. Is he just appearing other with others who may be in a gang, although those persons in the video aren't identified either? Further, the characterization of 800

_____

[8] The FBI chart, previously provided, does have several associates listed. They are not those discussed by the government here.

Block as CDP's "strongest ally" is of questionable origin. It is not clear what that means other than some 800 Block videos briefly mention a few CDP members, and some have some CDP members appearing in their videos. That is extremely circular.

Apparently, this is another attempt to bring in discussion of the Western Addition gangs and their activities, an approach the Court has already rejected in the context of expert testimony. Doc. 927, at 13-17. It is also designed to circumvent the Court's ruling on opinion regarding inter-gang communications through rap songs. Doc. 927, at 17-18. Interestingly, not one act by a non-CDP member is alleged in the indictment or the notice of acts. Doc. 851. How such acts now become relevant and admissible is not explained.[9]

In fact, only rappers Drama and Ivy are alleged to be CDP members, and neither specifically talks about any activity by CDP. Neither are on trial here.

Another broad generalization that turns out to be not accurate are that the songs all "prominently feature" CDP members and the "majority" discuss CDP criminal activity. Doc. 974, at 10. It turns out that none of the videos actually describe criminal activity by any other CDP member, with the exception of perhaps a reference to a Group 2 defendant having a "head shot." Still, the government has to offer an interpretive reading that is nowhere apparent from the lyrics themselves. For instance, much is made of the lyric that "Tit" made "thousands." Doing what is not described in the song. The government believes it must be referencing the killing of Mr. Levexier because they believe Gordon "collected" on a ransom that was placed on Levexier. But, there is nothing in the lyrics to even approximate that theory. Doc. 974, at 13. And, the government is careful not to say their informant will testify these lyrics reference that event.

_____

[9] Of course, this will generate an entire new round of gang task force litigation and discovery. It is too late in the day to begin another 10-month odyssey of difficult, contentious and expensive efforts to get SFPD to disgorge gang materials.

Rapper Brooks, adopting a gangster persona, talks about oxycontin in Washington State, which isn't attributed to anyone. There is a reference to "rocking with" 2 Rock, an entire neighborhood known as the Double Rock Projects, with its own gangs (not KOP). It is also referenced in the context of "rocking" with Big Block, a gang in Hunter's Point. There is no indication anywhere that Mr. Brooks has any involvement with any of these gangs, nor does CDP for that matter. Nor is there any indication of violence towards anyone there, quite the opposite, they are "rocking" together. It obviously references how wide-spread the fictional character's acceptance is throughout various rival areas. Somehow, because one of the KOP victims resided in one of the mentioned neighborhoods (for how long is not stated), it must be about him. (Doc. 974, at 14). That is a very lengthy stretch, even for an informant, and will require a hearing before the testimony or video is introduced.

Taken in this context, it is easy to see why the evidence should be excluded. It is either irrelevant, is cumulative and is unduly prejudicial. Fed.R.Evid. 401, 402, 403. Further, it denies the defendants their rights of Confrontation under the Sixth Amendment not to present the testimony of the rappers so that they can be subject to cross-examination as to the meaning of what they rapped to, and whether it in any way reflects reality.

### 3. Rap Videos Themselves are not Evidence of a Conspiracy

The government believes that rap videos with alleged conspirators together are admissible to demonstrate "association." Doc. 974, at 10-11, 16. Mostly, this involves individuals who are not defendants in Group 1 seen with and perhaps discussing others who are not CDP or defendants in Group 1. This is one simple reason they aren't relevant to demonstrate "association."

If merely being seen together were the real purpose for the videos, all that would be required is testimony that certain individuals appear in certain rap videos together, or still photos from the videos. The same is true for alleged rappers describing a territory (which is nowhere

10

apparent or otherwise described in the government's briefing).  None of this requires a video be introduced.  All of it, presumably, will be testified to by government witnesses.  In fact, there are a multitude of police reports where alleged CDP individuals are seen with each other.

Association of the defendants and co-conspirators (the real ones who are CDP and identified associates engaged in criminality) is problematic because the government does not actually identify any defendant associating with anyone.  Rather, they are "featured."  There are some groupings that are obvious, but they aren't described.  Others, though, "feature" a defendant or co-conspirator extremely briefly (one clip in a montage) and by themselves.  How this establishes association is unclear.  If the government is going to insist that such material be used, they at least have the obligation to specify what it is.  The fact that they haven't is unhelpful.

Further, there is no discussion of how association in a rap video reflects association in a conspiracy.  The cases cited demonstrate the government's faulty argument that merely appearing in a video together is relevant to prove conspiratorial association. Doc. 974, at 16. It cites *United States v. Conners*, 825 F.2d 1384, 1390 (9th Cir.1987), a case where under Rule 404b, the observation was two co-defendants committing drug crimes together.  *United States v. Normandeau*, 800 F.2d 953, 956-57 (9th Cir.1986), also a Rule 404b case, permitted the evidence because it was similar to that charge – meeting to obtain imported parts.  There is no such allegation of a depiction of similar conduct here.  The associational evidence at issue in *United States v. Robinson*, 978 F.2d 1554, 1562 (10th Cir.1992), was testimony that the defendant was a gang member, not testimony he was seen with someone else in the alleged conspiracy. Because the rap songs don't evidence any criminal conduct by any defendant, or even approximate one (there are just bopping their heads) they aren't evidence of association for a conspiratorial purpose.

Finally, in order to establish relevancy, a hearing as to these depictions and their value will have to be held. It is simply not possible given the characterizations here.

11

**4.     Statements in Rap Videos are not Co-conspirator Statements**

The government requests this Court hold that rap videos by alleged gang members Ivy, Ogbaugu and Noriega are admissible against other gang members because they are co-conspirator statements under FRE 801(d)(2)(E).   The objective here is to avoid having to call the songs' authors to establish what is meant by clearly ambiguous statements in the songs, and depriving the defense of cross examination.

Initially, as Mr. Williams has previously noted, such statements were not in the government's co-conspirator disclosure.  For this reason alone, they are inadmissible.

"Before an alleged co-conspirator's statement can be admitted into evidence under Rule 801(d)(2)(E), the government must establish that the declarant. . . knowingly participated in a conspiracy." *United Sattes v. Liera*, 585 F.3d 1237, 1245 (9th Cir. 2009). In addition, "[t]o establish that the declarant knowingly participated in a conspiracy, 'the government cannot rely solely on the [alleged] co-conspirator statements themselves.'" *Id.* at 1246 (quoting *United States v. Castaneda*, 16 F.3d 1504, 1507 (9th Cir. 1994)).  Thus, the government must show that it is more likely than not that the declarant was a co-conspirator.   This is impossible for the government to do here, except for perhaps Ivy, Ogbuagu and Young.

In addition, the statement must be in furtherance of a particular conspiracy. *See, e.g., United States v. Moran*, 493 F.3d 1002, 1010 (9th Cir. 2007) ("Statements made for personal objectives outside the conspiracy or as part of idle conversation are not admissible under Rule 801(d)(2)(E).  All of the songs fit into "personal objectives" of establishing themselves as rap artists rather than advancing anything.  And, merely describing is not furthering any conspiracy. On this, the government has failed.

Noreiga isn't even alleged to be CDP.  How his statements further a conspiracy is not made clear: they must intend to do so.  Here, "Neva Luhhed Us" and "Real One" are two years

after the defendants' arrests.[10]  The best the government can say is that he is 800 Block, which is an "ally."  This status, though, is even more unclear.  And, it is still not clear how rap songs that merely mention the names of CDP members are conspiratorial in any manner.

More importantly, as Mr. Williams has previously demonstrated, no court has ever held artistic endeavors are 801(d)(2)(E) evidence.  Not one case in the government's lengthy briefing permits this. Doc. 974 at 18-20.  The best the government can do is point to a case where a defendant charged with a hate crime adopted a racist song by singing it himself and playing it right before a cross burning.  *United States v. Magleby*, 241 F.3d 1306, 1318-19 (10th Cir.2001).  This is not 801(d)(2)(E) evidence – it is part of the crime itself, which required proof of racial animus.

All the cases cited by the government involve the defendant either discussing the crime or participating in it, i.e. admissions. *United States v. Herron*, 2014 WL 1871909 (ED NY 2014) (videos shows defendant identifying himself as gang member, firing weapons, vowing retaliation and bragging about leadership role): *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir.2010), involved lyrics the defendant himself wrote and signed with his aliases. *See also United States v. Montes*, 421 Fed. Appx. 670 (9th Cir.2011) (defendant's own video);  *United States v. Foster*, 939 F.2d 445, 455-57 (7th Cir.1991) (defendant's own lyrics in his notebook);  *United States v. Stuckey*, 253 Fed Appx 468, 482–483 (6th Cir. 2007) (defendant's own rap lyrics); *Zepeda v. Hubbard*, 2013 WL 1832693 (ED Cal. 2013)(use of defendant's own rap lyrics upheld under deferential AEDPA review); *McDonald v. Haws*, 2011 WL 768130 (SD Cal. 2011)(rap by defendant, and defendant shown committing crimes with co-defendant).  None of the rap in this case involves this type of admission.

---

[10]  The videos by rapper Drama, "Anxious" and "Poundcake" also post date the arrests.  It is difficult to imagine how post-arrest statements by others are in furtherance of the conspiracy as it existed with those no longer in it.

The reason no court has adopted the government's position is that rap songs are not in furtherance of any conspiracy. The most the government can say is that CDP members are "featured and/or referenced with affection" and that informants will establish that CDP and 800 Block are closely allied (to show that 800 Block rapper's references with affection are admissible). Doc. 974, at 18. Affection would cover mothers, bothers, pastors, children. Apparently, anyone who expresses like or support for an alleged CDP member is furthering a criminal conspiracy?

The other allegation is that the songs "discuss the federal case." Doc., 974, at 20. From the descriptions of the various songs, this means the protagonist expressing hope for the defendants' freedom. Doc. 974 at 11 ("free" various defendants); *Id*., at 12 (expressing appreciation for co-conspirators who helped him when incarcerated; asking others be freed);

The final allegation is that there are threats to CDP rivals. Doc. 974, at 20. But, they aren't identified. Is it up to the government to particularize 801(d)(2)(E) statements. The only possible one is in "Anxious", where rapper Drama talks about riding in a car with a gun and the government alleges refers to traveling through KOP territory where "no one dares approach him." Doc. 974, at 12. But, the lyric doesn't support this contention and there is no representation that any witness will. It does not mention any territory at all other than "in the streets", not does it mention KOP. It appears to be a reference to other rappers ("rap niggers") who are lying and "never had it", and who aren't authentic because they don't have a "hood."

There are two videos with lyrics the government interpret as threats to informants. The first, "Neva Luhhed Us" only talks about how he doesn't "understand" someone who testifies against other African-Americans. Doc. 974 at 12. That is not a threat or in furtherance of anything. The other, not by a CDP member, merely talks in a similar vein about those who turn on others. There is no specific threat to anyone.

///

**5.  The Rap Songs are not Intertwined with the Charges**

At the very end of this Motion, the government inserts a paragraph that each video is "inextricably intertwined" with the crimes rather than Rule 404b evidence of other crimes. Doc. 974, at 23. But, nearly all of criminal activities have nothing to do with the defendants. For instance, rapper Drama's description of his protagonist's possession of a gun; Ivy's possession of guns in his rap video; 800 Block member Gilasi's depiction of marijuana are all acts having nothing to do with the charges against the Group 1 defendants.

**C.  The Government's Characterizations of the Rap Songs Does not Demonstrate Relevance and Omits the Prejudicial Material.**

**1.  "Neva Luhhed Us"**

The government begins with a very weak case of relevance. Doc. 974 at 11-12. As discussed above, Noreiga's connection to this case is simply too tenuous to permit his videos. Its asserted relevance is because it refers to individuals the government believes are CDP members. CDP is never mentioned; no CDP members appear; no criminality by CDP is discussed. The video is not alleged to take place in CDP territory, and it is plain that it does not.

The government did not mention that the video begins with a machine gun blasting rounds, obviously meant for artistic effect. This is an apt metaphor for the whole use of rap. The video is replete with "niggas" and "bitches." It shows young African-American men walking in a menacing manner (a least to white jurors) and making hand signs like they are using guns.

Talking about this case is not evidence of a conspiracy. This protagonist describes caring for the well-being of those put in prison in this case. He describes someone who testified against that person's friends (who was testified against isn't clear because there's been no testimony in this case by a cooperator). So what? Is it a surprise that there is distrust of law enforcement in the African-American community in general and distrust of those in that community who assist in putting young African-American men in prison? This individual is saying he doesn't understand

15

it, and, at that moment, a subject in his video who is not CDP points his fingers as if shooting. This generalized sentiment, which is held by many non-gang members, proves nothing about this case or the defendants, or CDP or any particular group, for that matter.

Most of the song appears to be about African-Americans who don't love each other, the damage that has caused to the protagonist's friends and loved ones, and his efforts to stay out of poverty. Of course, it's all couched in gangsta rap terms, with references to money, bitches, niggas, guns and drugs, all exaggerated for effect.

## 2. "Anxious"

There is no video of this rap song on YouTube, only audio.

The main relevance is supposedly the protagonist mentions CDP members as being kind to him when he was incarcerated, and asks that they be freed. Doc. 974, at 12. How that furthers a conspiracy is never mentioned. African-American friends and family support those in prison on a massive scale due to the mass incarceration of African-American men. It does not evidence criminality or indicate furtherance of any conspiracy to care about and assist those who are incarcerated.

Supposedly, the protagonist is taunting KOP, a rival gang. According to counsel, but not attributed to any cooperator or expert, CDP and KOP taunt each other in rap songs. Doc. 974, at 12. The quote, though, doesn't mention any particular group or area. In fact, it appears as if he's talking about other rappers ("half you **rap** niggas out there be lyin'"). Again, this is all in the persona of someone incarcerated who is thinking about his activities when free, exaggerating it for effect. For instance, having a 30 or 40 may be a reference to having guns; clappin' is a reference to the others shooting all around him. No affiliations of any kind are mentioned. Driving with a semi-automatic is referenced as well. Again, without any references to CDP or any other gang, or about gang-related activities. These are the stock-in-trade of all gangsta rap. Noticeably, there is not one reference to anyone else doing anything.

16

Finally, he requests relief for those incarcerated in this case. Again, that is not evidence of anything, or in furtherance of anything, except justice.

### 3. "Poundcake"

It does not appear the rap is about what the government says it is. Doc. 974 at 12-13. The government's theory is that a very small portion references KOP and the homicide of KOP member Levexier.[11] The lyrics, however, do not mention KOP or Levexier at all. They do not mention shooting anyone for that matter. And, they do not mention any of the Group 1 defendants. As described above, they only mention one CDP member and someone else who made money for something over some length of time.

Noticeably, the government is not representing their informant will identify this song as about these events, only that there was a bounty and Gordon cashed in on it. But, regardless of whether Levexier had a ransom as a result of his actions, and regardless of whether Gordon, Ferdinand and Carmichael cashed in on it, it is not clear how this song says so.

The protagonist then says his mother is happy he's home from jail, and that others were happy he was gone, but that he's back and if they should "get at him." To the government, "had you niggas runnin like a track meet" in the past tense means that there is a future threat. This is an extremely stretched interpretation not attributed to anything other than conjecture by government counsel.

The government alleges the Drama's protagonist references Mr. Heard and Mr. Ferdinand having guns. Perhaps this is reciting the indictment or some other rumor. It is not clear as the government does not assert that Glocks were involved in any crime. And, even the government has to admit the allegation against Mr. Ferdinand is a rumor itself. How repeating a rumor can be

---

[11] The government's theory is that Levexier was suspected of being responsible for the homicides of two unarmed alleged CDP members, and the shooting of another and his pregnant wife.

in furtherance of the conspiracy is not explained.

The defense has already explained how the phrase "gang of money" is ubiquitous. And, it is not clear how asserting someone has money is a reference to gang activity. As noted in another context, it is important not to fall into the false paradigm that African-Americans from certain backgrounds bragging about money means they are involved in criminality, or attach any criminality to it.

### 4. "Big Bank"

Simply because African-Americans from the neighborhood where Mr. Brooks grew up are proud of him and his artistic endeavors, that does not render his songs admissible against the defendants. In fact, "Big Bank" is a strongest example of a rap artist taking on a gangsta persona and using that metaphor. There is no question that Brooks, the author and main figure in the video, is not involved in criminal activity, and never has been. He is, as the government says, "from Fillmore" (along with 13,000 others). "Big Bank", which has a gangsta persona describing to himself and others all sorts of criminal activities, and making "millions", is pure fiction.

While Mr. Williams appears in several clips in front of his house, it does not depict him as involved in narcotics activities or firearms, as the government asserts. Doc. 974, at 14. Rather, he is, as the song indicates at that moment, sitting on his grandmother's steps. He acknowledges the calling of his name by Mr. Brooks in a brief nod and finger wave back. The lyric is about how they used to sit on those steps. He has in his hand what the government thinks is a stack of money that is shown very briefly (hardly displaying money), but which could well be a fake prop (a stack of singles or one bill on top). The display of money is ubiquitous in gangsta rap.

By conflating various different parts of the song, the government argues this is an adoptive admission to the remainder of this segment of Mr. Brooks's song. The segment begins with a description of some other individual (or the protagonist) making money in Seattle selling drugs, perhaps someone named T-fats who has returned home, and how he, the protagonist, is

making money that he intends to give back to the neighborhood.  The lyric then switches to Mr.

Williams (Me and Fonzo) sitting on their grandmother's steps, where Mr. Williams is at that

moment.  He nods and raises a finger in acknowledgement to his name.  The song then goes on to

state "Mac-10" and Mac-11" (without describing any activity relating to guns), and starts another

segment about how the protagonist is driving around town with his cousins and money that others

can't take from him.

Thus, the adoptive admission, if there was one, was to his name and description as sitting

on the steps, which is what he's doing in the video. *United States v. Monks*, 774 F.2d 945, 950

(9th Cir.1985)(there must be sufficient "foundational facts" that reasonably infer that he heard the

entire statement, knew what it meant, and agreed to it).  The government cites no case that even

approximates adoptive admissions by appearing in a rap video and acknowledging one's name

when it is called, and having money in one's hand.  In fact, they cite no support at all.[12]

The video does not "feature prominently" most of the CDP members the government

asserts it does.  Doc. 974 at 13-14.  Most are briefly pictured as props, along with many other

people.  Mr. Williams' uncle, Dean Maye, is now an "associate" because he appears.  Several

older African-American men also appear at a local restaurant, the Bar-B-Que Pit, one of the last

old-style African-American eateries in the area.  Because these African-American defendants also

frequented one of the last establishments to succumb to gentrification, it must be of nefarious

purpose, just like the Grove Street address.

It is interesting to note the evolution of the Grove Street address, which is where Mr.

Williams grew up and his grandmother lived until her death during his incarceration for this case.

---

[12] To further complicate the government's argument, Mac-10 and Mac-11, while weapons, are nicknames in rap.  https://en.wikipedia.org/wiki/Mack_10.  There is no offer to testimony that either Mr. Williams or Mr. Brooks ever possessed or used such weapons, and no such allegations appear in the discovery.  It is another example of using street vernacular associated with violence as metaphor to establish the bona fides of the artist.

At one point, it was an address where Mr. Williams lived; at another, it was an address that was frequented by CDP members, some of whom have their names on a wall that has a hundred names on it of people from the dwindling African-American population of that area. Now, it is "headquarters." It is one of the last African-American owned homes in that area and is across the street from Mr. Brooks's former childhood home. If he or any other rap artist from that neighborhood were to shoot a video from their neighborhood, that would be a logical location regardless of any activities alleged to have occurred there.[13]

The fact that Mr. Brooks displays 2-fists with thumbs up at one point is given meaning. But, as Sgt. Jackson noted, it has become a symbol for anyone from the neighborhood, which is all Mr. Brooks is. Notably, his character references from Divis to Van Ness as an area he frequents, which, if the Court will recall the Jackson testimony, is not CDP territory. Exh. 7.

This is why the government's construction of the supposed Helton homicide reference is incorrect – the protagonist is saying he's welcome in all neighborhoods and powerful in them because they are his *friends*, not because they are enemies. Doc. 974 at 14. That is how he references those who he was close with who were KOP but were killed, and who still are KOP (my cousin's baby's daddy). That is how he references 2 Rock (a large San Francisco housing project in Potrero), and Big Block. Even if Brooks references the Jevon Helton shooting, which is extremely questionable in light of the quoted text, that doesn't mean the statement is in furtherance of a conspiracy. Many rap artists refer to many homicides of many people, both gang members and non-gang members. Assuming this is a reference to Helton, Brooks, who is not a gang member, adopts a persona who talks about a well-known event.

---

[13] The alleged activities there are a 1997 arrest of Mr. Williams for drugs, and Mr. Williams retrieving a gun from his car parked outside the house the night of the Sneed homicide in 2012. Apparently, Mr. Gordon entered the house at in 2011 when Mr. Williams did not reside there and bullets were found there about a week later. Another activity was Mr. Williams' grandmother serving hot food to neighborhood youth after hours in the garage.

The vast majority of the video, not discussed by the government, is typical exaggerated and highly prejudicial gangsta rap, with references to "murder squads", kidnapping for ransom, hoping a snitch dies (no one in particular), drugs and money, pimping, sadistic sexual practices and the like.  At least half of it takes place in and around other areas, including what appears to be a high-rise, signifying perhaps where he came from and where is he now and depicting the entire area where he has become successful despite others who have attempted to criticize him or attach on to his success.

### 5.    "Ridin with Dat 5th" (exhibit 8)

This is a highly prejudicial video and song that does not describe any of the defendants involved in anything, just the protagonist, who refers to himself as "Adolph Hitler", and who talks about guns (briefly) but mostly money and relationships with women, and shooting others. He calls himself a "savage thug" who is flooding the City with drugs, and shooting at least four (4) people.  It shows guns in Ivy's hands.  It also frequently displays money.  It is typical, prejudicial gangsta rap.

Demonstrating the fictional character of this rap, the government does not allege that Ivy was involved in any of the shootings he describes.

The Grove Street address is depicted, at a time when search warrants indicated Mr. Williams was not residing there.  Several other locations are shown as well.  Most of the video takes place either in a car or under the Bay Bridge.

The government alleges that one of the clips involving a gun, when Ivy wakes up and gets dressed and takes a gun, is inside 1458 Grove.  That is not at all clear and, judging from the photos obtained during searches, does not appear to be the case.  It is not attributed to any informant.  Rather, it seems the government is assuming this because Ivy is also seen in several clips of the montage outside the address giving his rap.

The government's other main tether is that CDP members appear in the video and that he

21

references killing Levexier.  Again, the "featured" and "prominently featured" characterizations appear to mean very brief clips.  As discussed above, appearing in a video by someone is not evidence of adopting the lyrical content of a rap song, and the government does not assert that here.  Further, there is no indication Ivy shot Levexier, and the government's notice alleges otherwise. Dkt. #851, at 2 (Group 2 defendants Ferdinand and Gordon, unindicated conspirator Carmichael).

### 6.   Strickly Pimping Audio

In addition to being a well-known rap song by other artists, Mr. Young's version repeats over and over that the "bitch" has to pay a pimp.  It is not alleged this song is about anything involving anyone else, and isn't confined to any location or activity by others.  Even if admissible as an admission, it is not admissible against anyone else, and is only another reason to sever his case.

Much is made about the phrase "across the nation."  Doc 974, at 17.  However, there is no allegation in the briefing that this is what his plan was as reflected in the rap.  The phrase is well-known as meaning one's fame is wide-spread, which is untrue.  It appears, once again, that this is fictional characterization and deliberate hyperbole.

Even if the stanza quoted by the government is admissible, there is no justification for the remainder.  In fact, there is good reason not to admit it.  Part of the government's allegation is that pimping not just by Young, but by others, involves coercion, even if there is no objective evidence of such.  This rap song is done in a menacing and demeaning tone, insistent that one must pay a pimp.  There is real prejudice from this for an otherwise weak case, resting solely on an FBI agent's testimony that all pimping is coercive.

### 7.   "Real One"

Another song by Noriega, who is not a co-conspirator, "Real One", takes place nearly entirely in the studio and well after the arrests here.  Apparently, there is a reference to a

cooperating witness in this case (who may well be a cooperator in many cases). It references those who tell on others in general rather than any particular person (niggas sittin' down for years; niggas turned Fed; niggas getting to confessin' for years).[14]   The threats aren't by the rapper's character.  Instead, it references that informants aren't safe from other "niggas." They are referenced as "fake" and he refers to himself as "real." This is extremely remote.

In contrast, the song is also filled with talk about drugs, guns, "real shit", "making a killing", sexual intercourse and demeaning treatment of women.  It is all a gangster persona that Noriega adopts to make a point, not even alleged to reflect real-life events or activities.

### 8.     "Racks" Video

Another Noriega video, it apparently includes one CDP member, Harding.  It is not alleged he is doing anything.  Doc. 974, at 15.  The firearms possessions, from the government's briefing, are by 800 Block members. It takes place entirely in an area of apartments built for poor families, rather than the alleged CDP area west of Divisadero.  It depicts several guns and shooting gestures.  Because it refers to some CDP members, it is alleged to be "probative."  Of what is not explained.

### 9.     Other Videos

"Still in the Hood", "Loud Thoughts" and "Gangstas on Grove" are by rappers describing areas different from CDP, except for a brief clip of the Grove Street address in one.  All allegedly show CDP members, but the appearances seem to be extremely brief clips, some with no one else.  None are alleged to be committing criminal acts or referring to them. Doc. 974, at 15-16.

Ostensibly, the use of these is to show the defendants together with co-conspirators, and

---

[14] There were any number of informants, and one in particular, for a case against KOP member Owens and others that the government brought years ago.  There been other prosecutions of Uptown gang members as well. Without any attribution in the lyric or by an informant, it is impossible to identify this lyric as involving this case.

firearms. Doc. 974, at 16. As it has throughout, the government has not alleged that any defendant is seen with any other defendant, or CDP member. The firearms, however, are not possessed by CDP (if they had been, the government would have explicitly said so), making their depictions prejudicial – because someone who knows CDP members and has a few clips of them in a video that also portrays drugs and guns, CDP members must be associated with that activity? This is exactly what is not permitted.

Even if the defendants are in small snippets of these videos, that mere association is insufficient to permit highly prejudicial videos such as these. There are constant depictions of drugs, drug use, drug dealing, firearms, money associated with criminality. None of this, apparently, has anything to do with the Group 1 defendants, the defendants here or CDP.

For one, "Gangstas on Grove", the geography seems off. CDP territory, according to the FBI and Sgt. Jackson, runs west of Divisadero along Grove. The section referred to, apparently, is east of CDP territory towards Buchanan.

**D.** **The Jury Cannot Sort out the Rap Evidence without Extensive and Time-Consuming Litigation and Presentation**

It is insufficient to say the jury can sort all this out. The introduction of such material, none of it of obvious relevance to this case or these defendants, is highly prejudicial. As far as association with each other and alleged co-conspirators, there is no relevance that outweighs the prejudice, and no reason still shots cannot suffice. For the remainder, statements by others not demonstrated to be in furtherance of the conspiracy are inadmissible hearsay. Broadening the conspiracy charges to include other gangs and their members and activities does not assist the government here. There still must be some tether to these defendants.

Finally, if the evidence is used, the defense will be forced to engage in its own interpretative presentation, with a host of time-consuming testimony and evidence, and another 15-month-long effort to obtain information from SFPD about those whose videos these are and

who are depicted in them, and their relevance to this case.  Expert testimony will be necessary to explain the difficulties associated with interpreting this evidence, some of which are discussed herein.[15]  This time-consuming effort is certainly prohibitive given the limited showing of relevance.

Date:   May 16, 2016                                             Respectfully submitted,


                                                                  /s/  John Grele


                                                                 JOHN R GRELE
                                                                 Attorney for Defendant,
                                                                 ALFONZO WILLIAMS

---

[15] To the extent the Court admits any rap songs or videos, Mr. Williams will move to reconsider the denial of the right to present expert testimony by Professor Kubrin, and will re-notice her opinions based on what is ruled admissible.  Two features will be the notion that appearing in a rap video reflects adaptation of what's being said or reflects associational relationships.